992 A.2d 624 (2010)
Georgia TUTTLE, M.D. & a.
v.
NEW HAMPSHIRE MEDICAL MALPRACTICE JOINT UNDERWRITING ASSOCIATION and another.
No. 2009-555.
Supreme Court of New Hampshire.
Argued: October 15, 2009.
Opinion Issued: January 28, 2010.
*629 Nixon Peabody, LLP, of Manchester (Kevin M. Fitzgerald, W. Scott O'Connell, and Gordon J. MacDonald on the brief, and Mr. Fitzgerald orally), for the petitioners.
Michael A. Delaney, attorney general (Anne M. Edwards, associate attorney general, and Glenn A. Perlow, assistant attorney general, on the brief), and Rackemann, Sawyer & Brewster, P.C., of Boston, Massachusetts (Eric A. Smith and J. David Leslie on the brief, and Mr. Leslie orally), for the State defendants.
William L. O'Brien, of Concord, & a. for the New England Legal Foundation and National Association of Mutual Insurance Companies, as amici curiae, joined by forty-nine members of the New Hampshire House of Representatives.
David I. Frydman, House Legal Counsel, for Terie Norelli, Speaker of the House, and Sylvia B. Larsen, Senate President, as amici curiae.
Sulloway & Hollis, PLLC, of Concord (Martin P. Honigberg and Amy Manzelli on the brief), for the New Hampshire Medical Society and the American Medical Association, as amici curiae.
CONBOY, J.
The State of New Hampshire, the Commissioner of Insurance, and the State Treasurer appeal an order of the Superior Court (McGuire, J.) declaring Laws 2009, 144:1 (the Act) unconstitutional. The Act requires the New Hampshire Medical Malpractice Joint Underwriting Association (JUA) to transfer a total of $110 million to the State's general fund during fiscal years 2009, 2010, and 2011. The trial court ruled that the Act constituted a taking without just compensation in violation of Part I, Article 12 of the State Constitution and the Fifth and Fourteenth Amendments to the Federal Constitution, and that it impaired the petitioners' contract rights in violation of Part I, Article 23 of the State Constitution and Article 1, Section 10 of the Federal Constitution. The trial court also decided that the State had no right to any "excess surplus" funds held by the JUA because the JUA is not a state agency. Because we find that the Act constitutes a retrospective law that results in impairment of contract rights in violation of the New Hampshire Constitution, we affirm.

*630 I. Procedural History

In June 2009, the petitioners, present and past policyholders of the JUA, on their own behalf and on behalf of a purported class of policyholders, filed a petition for a writ of mandamus against the JUA, its board of directors, the New Hampshire Insurance Department (Department) and its commissioner, and for a writ of prohibition against the Department, the New Hampshire State Treasury (Treasury) and the State Treasurer. The petitioners alleged that, pursuant to their contracts with the JUA and certain administrative rules, they had a vested right in any excess surplus premiums collected by the JUA. The Act is based upon the State's assertion that the excess surplus held by the JUA amounted to $110 million.
The request for mandamus asked that the court compel the JUA "to evaluate its current surplus and determine what in its judgment should be declared earnings and returned to the [petitioners]." The request for a writ of prohibition asked that the court prohibit the Department and Treasury "from taking action in furtherance of [their] erroneous interpretation[s] of the insurance contract[s] and [New Hampshire Administrative Rule] Ins 1703.07(d)."
Also in June 2009, the petitioners, on their own behalf and on behalf of a purported class of policyholders, filed a petition for declaratory and injunctive relief against the State of New Hampshire. They asked the court to declare the Act unconstitutional because: (1) it was a retrospective law that substantially impaired their vested contract rights and, therefore, violated Part I, Article 23 of the State Constitution; (2) it constituted a "taking" of property and, thus, violated Part I, Article 12 of the State Constitution and the Fifth and Fourteenth Amendments to the Federal Constitution; (3) it impaired their contracts with the JUA and, thus, violated Article I, Section 10, Clause 1 of the Federal Constitution; and (4) it represented an unconstitutional tax in violation of Part II, Article 5 of the State Constitution. The trial court consolidated the cases.
The parties filed cross-motions for summary judgment. The State argued that the petitioners do not have vested property rights in any excess surplus funds held by the JUA, but have, at most, only an expectancy interest that is contingent upon actions by the JUA's board of directors. The State also asserted that any excess surplus funds belong to the State because the JUA is a state agency. After a hearing, the trial court ruled that the JUA is not a state agency, and that the Act violates both the State and Federal Constitutions because it constitutes a taking of property belonging to the petitioners, and because it impairs their contract rights. This appeal followed.

II. Facts
In 1975, the insurance commissioner determined that professional medical liability insurance was not readily available in the voluntary market, and that the public interest required such availability. See RSA 404-C:1 (2006). Accordingly, the commissioner adopted regulations creating the JUA to provide insurance coverage addressing the public need. See generally N.H. Admin. Rules, Ins 1700 et seq. The regulations also establish the plan of operation (the plan) for the JUA. See id. 1703. The plan has been in place, with some modifications, since 1975.
The JUA "was established to make available medical malpractice insurance for eligible risks." N.H. Admin. Rules, Ins 1701.01 (eff.Dec.1, 2000, exp.Dec.1, 2008). An "eligible risk" is "any health care provider operating legally in the state of New Hampshire," other than those who fail to *631 timely pay premiums, have an outstanding judgment due for premiums, or who do not provide the information necessary to effect insurance coverage. N.H. Admin. Rules, Ins. 1703.01(e). Each eligible risk insured by the association must "receive the same level of service as is generally available in the voluntary market." Id. 1702.04. The petitioners, as healthcare providers and current and former JUA policyholders, are such eligible risks.
The JUA is governed by a board of directors. Id. 1703.04. The commissioner is required to "grant the board the authority to exercise all reasonable or necessary powers relating to the operation of the association." Id. 1703.04(l). The authority of the board includes the power to operate and manage JUA funds by investing premiums. Id. 1703.04(p). The actual insuring functions are carried out by a "servicing carrier" chosen by the commissioner from among member insurers or qualifying non-member insurers, and the board itself acts as a servicing carrier if, for any reason, the commissioner does not appoint one. Id. 1703.05(c), 1702.04. The JUA enters into contracts and conducts its business independently of the Governor and Council and of the commissioner. See id. 1703.04(o).
The plan requires all insurers authorized to write liability insurance in the state to be members of the JUA. Id. 1702.01; RSA 404-C:3. All member insurers are required to share in the JUA's premiums, expenses, servicing allowances and losses, based upon their portion of net direct premiums written in the state. Id. 1702.03(a).
The JUA's funding mechanism changed on January 1, 1986, in response to a finding by the commissioner that the JUA did not have sufficient assets to cover claims arising from policies written from 1975 to 1985. Compare id. 1703.07 with id. 1703.08. To cover the deficits incurred prior to 1986, a 15% surcharge was assessed on every medical malpractice liability insurance policy issued in the state beginning in 1986, and continuing until the commissioner should determine that a deficit no longer exists. Id. 1703.08(a), (b), (d). The JUA's reserves accrued, and policies issued, on and after January 1, 1986, are separately accounted for. Compare id. 1703.07 with id. 1703.08. The JUA reserves in question are funded by policy premiums and the interest earned thereon. See id. 1703.07(a), 1703.04(p). The State did not contribute funds to the JUA at the time of its creation, and has made no contributions to it at any other time. The State is not responsible for any JUA shortfalls, and does not guarantee performance of JUA obligations. Any deficits in the post-1985 fund are to be satisfied by assessments against the members, who are then to be reimbursed through assessments against policyholders and surcharges on subsequently sold policies. Id. 1703.07(f). The post-1985 JUA fund has not experienced a deficit and, therefore, no assessments or surcharges have been necessary.
In the event of fund excess, as is purportedly the case here, the plan provides as follows:
(c) If premiums written on association business exceed the amount necessary to pay losses and expenses, the board shall apply such excess to repay members for assessments previously levied, in proportion to the amount paid by each member.
(d) If premiums written on association business exceed the amount necessary to pay losses and expenses and to reimburse members for all assessments pursuant to Ins 1703.07(c), then with review and approval by the commissioner as being consistent with the purposes of this chapter, the board shall authorize *632 the application of such excess in one or both of the following ways:
(1) Against and to reduce future assessments of the association; or
(2) Distribute the excess to such health care providers covered by the association as is just and equitable.
Id. 1703.07(c), (d) (emphasis added). The phrase "with review and approval by the commissioner as being consistent with the purposes of this chapter," was added in January 2009. Id. Also in January 2009, the regulations were amended to provide that "the [JUA] will promote the public interest in ensuring that consumers of health care services have adequate access to needed care." N.H. Admin. Rules, Ins. 1701.01.
The JUA issues individual policies to its policyholders. The policies are titled, "LIABILITY POLICY (Assessable and Participating)," or "GENERAL LIABILITY POLICY (Assessable and Participating)." Each policy provides that it "has been issued by the [JUA] under the New Hampshire Medical Malpractice Joint Underwriting Association Plan established pursuant to the Authority granted by RSA 404-C:1 and by RSA 400-A:15, and is subject to the provisions of the Plan." The policy provisions relating to assessments and dividends provide in full:
12. Assessable Policy Provision. This policy has been issued by the [JUA] under the New Hampshire Medical Malpractice Joint Underwriting Association Plan established pursuant to the Authority granted by RSA 404-C:1 and by RSA 400-A:15, and is subject to the provisions of the Plan. The Plan provides, and the named insured agrees, that in the event an underwriting deficit exists at the end of any fiscal year the Plan is in effect, the board of directors of the [JUA] may make a premium contingency assessment against all policy-holders during such year, and the named insured shall pay to the [JUA] the named insured's part of the premium contingency assessment based upon the policy premium payment paid by the named insured to the [JUA] with respect to that year. The Plan further provides that the [JUA] shall cancel the policy of any policyholder who fails to pay the premium contingency assessment.
13. Participating Policy Provisions. The named insured shall participate in the earnings of the [JUA], to such extent and upon such conditions as shall be determined by the board of directors of the [JUA] in accordance with law and as made applicable to this policy, provided the named insured shall have complied with all the terms of this policy with respect to the payment of premium.
(Emphasis omitted.)
Since 1986, the JUA has sought to make three distributions of surplus to its policyholders. In 1999 and 2000, the board submitted proposals for distribution and received approval from the commissioner; distributions were then made. The board's 2001 application for a distribution, however, was denied. The board has not requested a distribution since that time.
In 2008 the JUA was one of the three largest writers of medical malpractice insurance in New Hampshire based on premiums written. It wrote approximately $8.8 million of the estimated $40 million in premiums written. Of approximately 11,000 health care providers in New Hampshire, the JUA insures about 900. It has accumulated assets of $152 million.
In March 2009, the Department prepared a report indicating that the JUA's 2008 year-end surplus "is expected to be in the range of $140 million to $145 million... [as] a result of very efficient operations, *633 good claims management and sound investments over a number of years by the [JUA] board." The Department concluded that the "surplus significantly exceeds the amount of capital needed to support the [JUA]." The report stated that "[t]he Department has not engaged in any formal actuarial exercise in reaching this conclusion." The report was premised upon an estimate of "risk-based capital" that the Department commissioned on behalf of the JUA, which was submitted to the JUA with the following caveat:
It is [the actuarial firm's] understanding that [JUA] management will consider [these] findings for the purposes of evaluating the level of surplus required to support its ongoing operations of providing medical malpractice coverage in New Hampshire.
[The] report is not intended or necessarily suitable for any other purposes.
Under the heading "DISTRIBUTION AND USE," the risk-based capital estimate report reiterated, "[The actuarial firm has] prepared this report solely for [the JUA's] use as described.... It is neither intended nor necessarily suitable for any other purpose." The Department nevertheless relied upon the risk-based capital estimate and reported that it "believes that it would be reasonable to retain a surplus of $55 million to support the [JUA], allowing the remainder of the surplus to be transferred to the General Fund without placing the [JUA] under any significant financial risk." The JUA has not made its own determination as to what amount, if any, constitutes excess surplus.
On June 24, 2009, the legislature passed House Bill 2, which the Governor signed into law on June 30, 2009. The legislature found that "the funds held in surplus by the [JUA] in the Post-1985 Account are significantly in excess of the amount reasonably required to support its obligations as determined by the insurance commissioner," and concluded that "the purpose of promoting access to needed health care would be better served through a transfer of the excess surplus of the Post-1985 Account to the general fund." Laws 2009, 144:1, II. The Act accordingly provides:
Notwithstanding any other provision of law, the [JUA], by and through its board of directors, and any person having responsibility and authority for the custody or investment of the assets of the [JUA] are hereby authorized and directed to transfer no later than July 31, 2009 for the fiscal year ending June 30, 2009 the sum of $65,000,000, and by June 30, 2010 the additional sum of $22,500,000, and by June 30, 2011 the additional sum of $22,500,000 from the Post-1985 Account to the general fund. This sum shall be used for the purpose of supporting programs that promote access to needed health care for underserved persons.
Laws 2009, 144:1, I.

III. The Parties' Arguments
The State asserts that, under the circumstances of this case, we need not determine whether any JUA excess surplus funds belong to the State. Rather, it argues, we need only determine whether the petitioners have a "vested right" in such funds. It asserts that "[t]he nature of the JUA is properly considered only as it reflects on the question whether a person purchasing insurance from the JUA can reasonably claim to have a vested right in surplus protected against state action...." Thus, the State argues that the Act does not constitute an unconstitutional "taking" under either the State or the Federal Constitution, since the petitioners do not have a vested property right in any JUA surplus under their policies, the regulations comprising the plan, or the statutes by whose authority the JUA was created. *634 The State likewise contends that the Act does not violate the State constitutional proscription against retrospective laws or the Federal Contracts Clause because the petitioners do not have the prerequisite vested property right in any JUA surplus. Furthermore, it argues, even if the Act were a retrospective law, it would nonetheless be constitutionally permissible under the common-law balancing test requiring that the court examine whether the Act is reasonable and necessary to serve an important public purpose. The State also contests the petitioners' ability to assert claims derivatively on behalf of the JUA.
The petitioners counter that the Act constitutes a taking of property in which they have vested beneficial rights under the plain language of their policies and the regulations in place at the time their policies were purchased, in violation of both the State and Federal Constitutions. They maintain that the JUA is not a state entity and that its funds are private funds comprised of premiums paid and the interest accumulated thereon. They assert that the Act's interference with their contract rights violates the Federal Contract Clause and constitutes a retrospective law prohibited by Part I, Article 23 of the New Hampshire Constitution. Furthermore, they contend, the fact that the regulations comprising the plan may be altered by the legislature does not permit impairment of the beneficial interests that have already vested under their policies. The petitioners also assert that they may bring claims not only in their own right, but also derivatively on behalf of the JUA.

IV. Analysis
This controversy centers upon the tension between the constitutional proscription against governmental impairment of contract rights and the State's sovereign authority to safeguard the welfare of its citizens. See, e.g., Energy Reserves Group v. Kansas Power & Light, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); United States Trust Co. v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The relevant analytical framework for assessing a constitutional challenge to legislative action is well-established. "Whether or not a statute is constitutional is a question of law, which we review de novo." Akins v. Sec'y of State, 154 N.H. 67, 70, 904 A.2d 702 (2006). "The party challenging a statute's constitutionality bears the burden of proof." State v. Pierce, 152 N.H. 790, 791, 887 A.2d 132 (2005). "[T]he constitutionality of an act passed by the coordinate branch of the government is to be presumed." Opinion of the Justices, 118 N.H. 582, 584, 392 A.2d 125 (1978) (quotation omitted). "It will not be declared to be invalid except upon [i]nescapable grounds; and the operation under it of another department of the state government will not be interfered with until the matter has received full and deliberate consideration." Id. (quotation omitted); see also City of Claremont v. Truell, 126 N.H. 30, 39, 489 A.2d 581 (1985) ("A statute will not be construed to be unconstitutional where it is susceptible to a construction rendering it constitutional." (quotation omitted)).
"In this case, however, there is no question of statutory interpretation. The effects of the legislation are obvious and acknowledged. If those effects infringe on constitutionally protected rights, we cannot avoid our obligation to say so." Alliance of American Insurers v. Chu, 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672, 678 (1991) (citations omitted). We address the petitioners' claims first under the State Constitution, citing federal opinions for guidance only. See State v. Ball, 124 N.H. 226, 231-33, 471 A.2d 347 (1983).
*635 Part I, Article 23 of the New Hampshire Constitution provides: "Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." "Part I, Article 23 does not expressly reference existing contracts. However, we have held that its proscription duplicates the protections found in the contract clause of the United States Constitution." State v. Fournier, 158 N.H. 214, 221, 965 A.2d 1091 (2009) (quotation omitted). "Although the New Hampshire [retrospective law] provision affords more protection than its federal counterpart, this court has relied on federal contract clause cases to resolve issues raised under part I, article 23 where contract impairment, and not simply retroactive application of a law, was alleged." In re Grand Jury Subpoena (Issued July 10, 2006), 155 N.H. 557, 564, 926 A.2d 280 (2007). "We therefore understand article I, section 10 [of the Federal Constitution] and part I, article 23 [of the State Constitution] to offer equivalent protections where a law impairs a contract, or where a law abrogates an earlier statute that is itself a contract," and will refer to their equivalent protections as the Federal and State Contract Clauses, respectively. Opinion of the Justices (Furlough), 135 N.H. 625, 630, 609 A.2d 1204 (1992).
"The party asserting a Contract Clause violation must first demonstrate retroactive application of a law." Petition of Concord Teachers, 158 N.H. 529, 537, 969 A.2d 403 (2009). We have held that "every statute which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective." In the Matter of Goldman & Elliott, 151 N.H. 770, 772, 868 A.2d 278 (2005) (quotation omitted). Thus, "[i]f application of a new law would adversely affect an individual's substantive rights, it may not be applied retroactively." Id.
The vested rights that the petitioners assert as the predicate for their claims are grounded in their contracts with the JUA. See, e.g., Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 37, 871 A.2d 18 (2005) (contract rights can constitute vested property rights). The transfers required by the Act occur over fiscal years 2009, 2010, and 2011. However, because we find, for the reasons stated below, that the petitioners' contracts embody vested rights, and that the Act impairs those rights, the Act "must be deemed retrospective." In the Matter of Goldman & Elliott, 151 N.H. at 772, 868 A.2d 278 (quotation omitted).
Contract Clause analysis in New Hampshire requires a threshold inquiry as to whether the legislation operates as a "substantial impairment of a contractual relationship." Lower Village Hydroelectric Assocs. v. City of Claremont, 147 N.H. 73, 77, 782 A.2d 897 (2001). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Id. (quotation omitted). If the legislation substantially impairs the contract, "a balancing of the police power and the rights protected by the contract clauses must be performed, and ... [the] law... may pass constitutional muster only if it is reasonable and necessary to serve an important public purpose." Furlough, 135 N.H. at 634, 609 A.2d 1204 (quotation omitted).
We note that other courts reviewing Contract Clause claims have expressed the balancing test using an array of phraseologies and placing emphasis on a variety of factors. See, e.g., In re Certified *636 Question, 447 Mich. 765, 527 N.W.2d 468, 474 (1994), cert. denied, 514 U.S. 1127, 115 S.Ct. 2000, 131 L.Ed.2d 1001 (1995); Pomponio v. Claridge of Pompano Condominium, 378 So.2d 774, 780 (Fla.1979). Ultimately, "Contract Clause cases involve individual inquiries, for no two cases are necessarily alike." Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 373 (2d Cir.2006), cert. denied, 550 U.S. 918, 127 S.Ct. 2133, 167 L.Ed.2d 864 (2007); see also Home Bldg. & L. Assn. v. Blaisdell, 290 U.S. 398, 430, 54 S.Ct. 231, 78 L.Ed. 413 (1934) ("Every case must be determined upon its own circumstances." (quotation omitted)). Accordingly, we take care to avoid a mechanical application of factors or criteria. Otherwise, we risk undermining the core task involved in resolving Contract Clause claims: striking a balance between constitutionally protected contract rights and the State's legitimate exercise of its reserved police power.

A. Substantial Impairment

1. Contractual Relationship
An insurance policy is a contract. See, e.g., Bates v. Phenix Mut. Fire Ins. Co., 156 N.H. 719, 722, 943 A.2d 750 (2008) ("The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties." (quotation omitted)). The undisputed facts of this case establish that some of the petitioners have current contractual relationships with the JUA, as documented by their insurance policies. It is these petitioners (hereafter "policyholders") whose Contract Clause claims we examine, because the petitioners whose contracts have expired may not assert such claims. See University of Hawaii Prof. Assembly v. Cayetano, 125 F.Supp.2d 1237, 1240 (D.Haw.2000) ("The contracts clause is only implicated when an existing contract is substantially impaired.").

2. Impairment of Contractual Relationship
Next, we must determine whether the Act constitutes a change in law that impairs the contractual relationships between the policyholders and the JUA.
We note that the trial court, after detailed analysis, concluded that the JUA is not a state entity. We need not, however, determine whether its conclusion was correct. Our examination of the policyholders' contract rights is not contingent upon the JUA's status as either a public or private entity, since Contract Clause protections apply in either case. See, e.g., In re Grand Jury Subpoena (Issued July 10, 2006), 155 N.H. at 564, 926 A.2d 280 ("Generally, the State and Federal Contract Clauses prohibit the adoption of laws that would interfere with the contractual arrangements between private citizens." (quotation, ellipsis and brackets omitted)); Furlough, 135 N.H. at 635-36, 609 A.2d 1204 (holding that individuals' contracts with the State are protected under the Contract Clause); Eckles v. State of Oregon, 306 Or. 380, 760 P.2d 846, 853 (1988), appeal dismissed, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989); Fraternal Order of Police v. Prince George's Cty., 645 F.Supp.2d 492, 508 (D.Md.2009) ("the Contract Clause applies to private and public contracts alike").
"Generally, the construction of a written contract is a question of law for this court." Riblet Tramway Co. v. Stickney, 129 N.H. 140, 146, 523 A.2d 107 (1987) (quotations omitted). "When interpreting contracts, the intent of the parties is determined based upon an objective reading of the agreement as a whole. Contractual language is construed according to its common meaning, and this court will give a contract the same meaning as would a *637 reasonable person." Id. (citations omitted).
In this case, the relevant language in each policy is clear and unambiguous. The title of each is either "LIABILITY POLICY (Assessable and Participating)," or "GENERAL LIABILITY POLICY (Assessable and Participating)." Each policyholder's right to participate in excess earnings is also explicitly set out in the body of the policy, which provides that each insured "shall participate in the earnings of the [JUA], to such extent and upon such conditions as shall be determined by the board of directors of the [JUA] in accordance with law and as made applicable to this policy." We note that participating policies in other contexts have in common a policyholder's entitlement to share in the company's excess surplus. See, e.g., Prairie States Life Ins. Co. v. United States, 828 F.2d 1222, 1223 (8th Cir.1987) ("Although taxpayer is a stock insurance company, it issues `participating' policies which, like the policies issued by mutual insurance companies, entitle the policyholders to participate in distributions from the annual divisible surplus of the company."); Ohio State Life Insurance Company v. Clark, 274 F.2d 771, 773 (6th Cir.), cert. denied, 363 U.S. 828, 80 S.Ct. 1599, 4 L.Ed.2d 1523 (1960) ("Mutual plan policies are `participating' policies in that... such policies are entitled to share in the profits of the company to the extent that such profits are apportioned from time to time to the respective mutual plan policies by the company's Board of Directors."); Gulf Life Ins. Co. v. United States, 35 Fed.Cl. 12, 13 (1996), aff'd, 118 F.3d 1563 (Fed.Cir.1997) ("[A] participating policy has a higher stated premium than the nonparticipating policy for the same insurance, but the policyholder expects to receive premium rebates in the form of policyholder dividends. These dividends are returned to policyholders based on the company's experience or the discretion of its management."). The policyholders' insurance contracts are, therefore, by both their titles and their content, "assessable and participating," expressly obligating the policyholders to pay premium assessments in the event an underwriting deficit exists at the end of any fiscal year and, conversely, entitling the policyholders to participate in the earnings of the JUA.
The nature of the policyholders' participation in JUA earnings is qualified by the phrase "to such extent and upon such conditions as shall be determined by the board of directors of the [JUA] in accordance with law and as made applicable to this policy." The law that was in effect at the time the policies were issued, and that was incorporated into the policies by reference, includes the JUA regulations. Those regulations define the obligations of the contracting parties. See Worthen Co. v. Kavanaugh, 295 U.S. 56, 60, 55 S.Ct. 555, 79 L.Ed. 1298 (1935) ("To know the obligation of a contract we look to the laws in force at its making."); Blaisdell, 290 U.S. at 429-30, 54 S.Ct. 231 ("[T]he laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." (quotation omitted)); Eckles, 760 P.2d at 858 n. 18 ("No law can impair the obligation of future contracts because the laws in existence when a contract is formed define the obligation of that contract.").
The regulations provide that, in the event of an excess surplus, "the board shall authorize the application of such excess in one or both of the following ways: (1) Against and to reduce future assessments of the association; or (2) Distribute the excess to such health care providers covered by the association as is just and *638 equitable." N.H. Admin. Rules, Ins 1703.07(d). These regulations, incorporated into the participating policies, provide no other alternative to the JUA board for disposition of any excess surplus JUA funds.
We find that the language of the policies and regulations, taken together, confers upon the policyholders a vested contractual right in the treatment of any excess surplus. The policies entitle the policyholders to "participate in the earnings of the [JUA]" and the incorporated regulations mandate the board's application of excess funds in one or both of two specified ways: either against future assessments, or distribution to the policyholders. Under either option, the policyholders have a direct financial interest, and not a mere expectancy, in any excess surplus. Thus, the policyholders have a vested right not necessarily in the distribution of the funds, but in the treatment of the funds for their benefit.
Importantly, the policyholders' vested rights are beneficial, rather than possessory. While a "beneficial interest is defined as a right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing," Nordic Inn Condo. Owners' Assoc. v. Ventullo, 151 N.H. 571, 575-76, 864 A.2d 1079 (2004) (quotation, brackets and emphasis omitted), such interest may, nonetheless, constitute a vested property right, subject to protection, see, e.g., Ohio State Life Insurance Company, 274 F.2d at 777 (holding that policyholders had "a vested contract right to the beneficial interest in the surplus" of the issuing non-mutual insurance company); Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 679 (finding a vested property right in the subject fund where the governing statute provided that the monies would either remain in the fund to accumulate interest or be distributed to the contributors). Here, the policyholders' interest in any JUA excess surplus is vested and not contingent: either they benefit from the surplus by its reinvestment for application against future assessments; or they benefit from the surplus by receipt of a dividend.
The significance of the policyholders' beneficial, rather than possessory, rights is twofold. First, because the policyholders' vested rights are in the treatment of any surplus funds for their benefit, but not necessarily in the distribution of such funds, the JUA board and the commissioner have the ability to protect against any undermining of the private market that could potentially result from immediate distribution. See N.H. Admin. Rules, Ins 1702.04, 1703.11(a); RSA 404-C:2, II (2006). Second, because the beneficial rights in the treatment of any excess surplus are contract rights, those rights vested in the policyholders upon issuance of their policies under the regulatory plan in place at that time, and are not contingent upon the declaration of a dividend, as argued by the State.
We draw support for our conclusion that the policyholders' beneficial contract rights are vested from the New York Court of Appeals' analysis in Methodist Hospital of Brooklyn v. State Insurance Fund, 64 N.Y.2d 365, 486 N.Y.S.2d 905, 476 N.E.2d 304 (1985), appeal denied, 474 U.S. 801, 106 S.Ct. 32, 88 L.Ed.2d 26 (1985), as contrasted to its analysis in Chu, 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672. In Methodist Hospital, the court upheld the transfer of $190 million from the state insurance fund to the state's general fund, concluding that, because the state alone was liable for the payment of claims upon that fund, because the policyholders had no responsibility to contribute to losses, and because the payment of dividends to policyholders *639 was discretionary, the policyholders had no property or contract rights in the assets or earnings of the fund. Methodist Hosp., 486 N.Y.S.2d 905, 476 N.E.2d at 309-10; see also Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 677. In Chu, however, where the legislation at issue diverted monies to the general fund in contravention of prior statutes which "provided that income earned on new contributions to the fund would be either returned to the contributors or credited toward future contributions," id. at 675, the court found the newly enacted law constituted an unconstitutional taking of vested property rights. Id. at 679.
The facts of this case distinguish it from Methodist Hospital and align it with Chu. Here, the JUA must satisfy claims out of its own assets and the State bears no liability for any deficit. N.H. Admin. Rules, Ins 1703.07(a). As the trial court found, "All of the money in the JUA fund has come from assessments of members, premiums paid by policyholders, and investment earnings. The State did not financially contribute to the creation of the JUA and has not contributed any funds since that time." It noted that "[i]f the JUA runs a deficit, as was the case in 1985, the members and policyholders are assessed to make it up. The State is not responsible for any JUA shortfalls and does not guarantee performance of JUA obligations." Further, the JUA regulations, rather than conferring discretion, mandate one or both of two options for application of any excess surplus, both of which inure to the policyholders' direct financial benefit. Compare N.H. Admin. Rules, Ins 1703.07(d), with Methodist Hosp., 486 N.Y.S.2d 905, 476 N.E.2d at 309. Thus, the plan here constitutes a nearly identical regulatory framework to that at issue in Chu.
In re Certified Question, 447 Mich. 765, 527 N.W.2d 468, to which the State attempts to analogize this case, is not only distinguishable, but in fact supports our conclusion as to the policyholders' vested rights. In that case, the plaintiff-policyholders of the state accident fund alleged that they had a property right to income from the sale of the accident fund, and that an act transferring all of the consideration for the sale to the general fund was, therefore, unconstitutional. In re Certified Question, 527 N.W.2d at 470. The Supreme Court of Michigan upheld the constitutionality of the legislation. Id. The facts of Certified Question, however, are significantly different from the facts here. First, although the Certified Question plaintiffs also had contracts with the accident fund, they alleged impairment of an asserted contract with the state, relying upon a statute to establish the contract provisions. Id. at 473-74. Here, the policyholders' rights arise directly from their contracts with the JUA. Further, the Certified Question plaintiffs relied upon an alleged implied contract right to surplus, in the absence of any contractual language entitling them to such surplus. Id. at 476. Here, the policyholders' participating policies expressly provide that the policyholders "shall participate in the earnings of the company" as the board determines, and the board's discretion is limited by regulation. Most significantly, the Certified Question court held, "Absent an explicit expression of the Legislature's intention that premiums collected and not used to pay liabilities either would earn interest or be refunded, we cannot read [the subject legislative provisions], either separately or together, as so promising." Id. at 477. In contrast, the plan before us provides such explicit regulatory expression.
We are not persuaded by the State's argument that the policies did not create vested rights because they are subject to *640 "applicable law," which may be changed. The three cases on which the State relies in support of its position, Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), Rhode Island Higher Education Assistance Authority v. Secretary, U.S. Department of Education, 929 F.2d 844 (1st Cir.1991), and Tancredi v. Metropolitan Life Insurance Company, 149 F.Supp.2d 80 (S.D.N.Y.2001), aff'd, 316 F.3d 308 (2d Cir.2003), are all distinguishable. Each involved constitutional, statutory, or contractual provisions explicitly providing that the regulatory scheme was subject to change. Bowen, 477 U.S. at 44, 106 S.Ct. 2390 ("Congress expressly reserved to itself `[t]he right to alter, amend, or repeal any provision of 'the Act. 42 U.S.C. § 1304."); Rhode Island Higher Educ., 929 F.2d at 847 (the subject agreements each stated that the parties "shall be bound by all changes in the Act or regulations in accordance with their respective effective dates"); Tancredi, 149 F.Supp.2d at 88 ("[T]he Constitution of the State of New York specifically reserves to the Legislature the right to alter laws under which corporations originally were formed" and thus constitutes notice that corporate charters may be amended by statute).
By contrast, the JUA policies provide:
8. Changes. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy...; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized representative of the company.
Nor do the regulations, incorporated into the policies, make reference to any governmental reservation of power to amend the obligations established by the plan or the policies. The State points to the provision in RSA chapter 400-A delegating to the commissioner the "full power and authority to make, promulgate, amend and rescind reasonable rules and regulations for ... the administration or effectuation of any provision" of the title governing insurance in general. RSA 400-A:15, I (2006). However, this legislative delegation of authority to the commissionerto make, amend and rescind insurance regulationsdoes not vitiate the binding nature of the regulations incorporated into the JUA policies, or constitute notice to the policyholders that their contracts with the JUA are subject to any law other than the law in effect at the time of the issuance of their policies.
In Rhode Island Higher Education, the court explained the basis for its holding that a statute imposing conditions upon reimbursement to reserve funds did not constitute an unconstitutional taking:
The public nature of the reserve funds themselves, coupled with the express contractual reservation of the power to amend the terms of the [federal student loan] program and the fact that the legislative changes involve a comprehensive federal/state social welfare program, forecloses a finding that the state agencies have obtained unalterable vested property rights to certain payments.
Rhode Island Higher Educ., 929 F.2d at 851 (quotation and brackets omitted). By contrast, the JUA policies, including the incorporated regulations, contain no provision indicating that they are subject to amendment by the legislature. Further, the policyholders here are private parties and not state agencies. Moreover, the Act is not part of "a comprehensive federal/state social welfare program"; rather, it targets only one discrete fund for transfer to the general fund.
*641 We appreciate the generally broad powers of the legislature to "change, modify and repeal existing law, and to enact new laws." Goldman, 151 N.H. at 773, 868 A.2d 278. However, in light of the constitutional prohibition against retrospective laws, such legislative power is not without restriction.
Unless otherwise inhibited by either the State or Federal Constitutions, the Legislature may change existing laws, both statutory or common, at its pleasure, but in so doing, it may not deprive a person of a property right theretofore acquired under existing law. Those rights are designated as vested rights, and to be vested, a right must be more than a mere expectation based on an anticipation of the continuance of existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another.
Id. at 774, 868 A.2d 278 (quotation omitted). "This doctrine reflects the deeply rooted principles that persons should be able to rely on the law as it exists and plan their conduct accordingly and that the legal rights and obligations that attach to completed transactions should not be disturbed." Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 678 (citation omitted). Therefore, we conclude that, contrary to the State's assertion, the provisions of the regulations in effect at the time of the issuance of the policyholders' policies, and incorporated into the obligations of those contracts, may not be changed retroactively unless such change survives constitutional scrutiny.
Because the policyholders paid for and received participating policies, incorporating the regulations in effect at the time, their beneficial interest in the treatment of any JUA excess surplus vested upon the issuance of their policies. The Act, diverting $110 million of purportedly excess surplus, thus impairs their contracts with the JUA.

3. Substantiality of the impairment
Having found that the Act impairs the petitioners' contracts, we next consider whether the impairment is substantial. See Furlough, 135 N.H. at 633, 609 A.2d 1204. Although the United States Supreme Court has provided little specific guidance as to what constitutes a "substantial" contract impairment, Baltimore Tchrs. Un. v. Mayor, Etc. of Baltimore, 6 F.3d 1012, 1017 (4th Cir.1993), cert. denied, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment," Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. 697.
The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.
Furlough, 135 N.H. at 633, 609 A.2d 1204 (quotation omitted). The degree of the Act's impairment of the contracts is particularly pertinent because
[t]he severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.
*642 Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (footnote omitted).
We recognize that the determination of whether a contract impairment is substantial may be influenced by whether the contracting parties relied on the abridged contract right. "[W]here the right abridged was one that induced the parties to contract in the first place, a court can assume the impairment to be substantial." Fraternal Order of Police, 645 F.Supp.2d at 510 (quotation omitted). The trial court found that "[t]he JUA has offered an assessable and participating policy approved by the Commissioner since its inception with no hint in the record that anyone had ever intended otherwise." The State does not contest this ruling, nor does it contend that any factual dispute exists regarding the participating nature of the policies. Neither does the State assert on appeal that the policyholders did not rely on the participating nature of the policies. Thus, under the circumstances of this case, whether any particular policyholders relied upon the participating nature of the policies is not relevant to our analysis.
In determining whether contract impairment is substantial, some courts look to whether the subject matter of the contract has been the focus of heavy state regulation. See, e.g., Energy Reserves Group, 459 U.S. at 413, 103 S.Ct. 697. If so, further regulation might be foreseeable and, thus, any change to the contract caused by such regulation would not necessarily constitute a substantial impairment. See, e.g., Mercado-Boneta v. Admin. del Fondo de Compensacion, 125 F.3d 9, 13-14 (1st Cir.1997). However, standing alone, "a history of regulation is never a sufficient condition for rejecting a challenge based on the contracts clause." Chrysler Corp. v. Kolosso Sales, Inc., 148 F.3d 892, 895 (7th Cir.1998), cert. denied, 525 U.S. 1177, 119 S.Ct. 1113, 143 L.Ed.2d 109 (1999); see also Mercado-Boneta, 125 F.3d at 14 n. 7 ("Contract Clause analysis would be enervated if the mere fact of regulation meant there was always foreseeability of more regulation and thus no substantial impairment.").
The simple fact that insurance is a heavily regulated industry does not preclude a conclusion that the Act substantially impairs the policyholders' vested contract rights to share in the JUA earnings. The policyholders did not "purchase[] into an enterprise already regulated in the particular to which [they] now object[]." Veix v. Sixth Ward Bldg. & Ln. Assn., 310 U.S. 32, 38, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). The State cites no provision of the regulatory scheme in place prior to the passage of the Act that would suggest that private insureds should anticipate the transfer of monies retained by their insurer into the state's general fund. Neither the JUA policies, nor the insurance regulations incorporated in the policies, make reference to any governmental reservation of power to amend the rights and obligations established by the assessable and participating policies. On the contrary, the policyholders' contracts expressly entitle them to participate in the JUA's earnings, and the regulations incorporated into their contracts likewise leave no potential outlet for the accumulated funds other than application against future assessments, or distribution to the policyholders. Although insurance is a heavily regulated industry, the record does not reflect a basis in law for the policyholders to expect that the funds in which they have a beneficial interest would be transferred from the JUA into the general fund.
In Furlough, we held that a legislative requirement that certain public employees be furloughed would constitute a substantial *643 impairment because such a requirement "impairs the very heart of an employment contract: the promise of certain work for certain income. Its impact would likely wreak havoc on the finances of many of the affected workers. . . ." Furlough, 135 N.H. at 634, 609 A.2d 1204. We have also found substantial impairment of contract rights by the legislature's retroactive repeal of a statute permitting municipalities to contractually set alternatives to tax obligations where such action resulted in an additional tax burden of nearly $40,000 to a plaintiff. Lower Village Hydroelectric Assocs., 147 N.H. at 77, 782 A.2d 897; see also State v. Vashaw, 113 N.H. 636, 637-38, 312 A.2d 692 (1973) ("The underlying policy of this prohibition is to prevent the legislature from interfering with the expectations of persons as to the legal significance of their actions taken prior to the enactment of a law.").
Here, we conclude that the Act substantially impairs the policyholders' contract rights for at least two reasons. First, the Act effectively eliminates the "participating" character of the policies, thus changing the very nature of the contracts. The effect of the Act is to dramatically reduce, if not eliminate, the policyholders' rights to a fundamental contractual benefitsharing in any excess surplus funds created by their premium payments.
Second, the Act divests the JUA board of its obligation to the policyholders to treat any excess surplus for their benefit, including protecting against insolvency. As the JUA advised the trial court,
The JUA can only comfortably state today that it has earned a profit or lost money in 1986, 1987 and 1988. It is incumbent on the JUA to protect the policyholders in the interim to maintain adequate surplus and defend those claims that may yet arise by keeping funds available for those uncertainties, both legally and in terms of the market.. . . [The board maintains] this conservative sense of the need . . . to make sure that there are funds there available. . . that there are sufficient funds within our own capital to fulfill the purpose of the JUA.
The trial court recognized the importance of a JUA surplus, including its impact on the policyholders, finding:
The assessable nature of their policies and consistent regulations point to the present benefit provided by any excess surplus. The surplus guards against having insufficient assets to cover JUA obligations which would have to be covered by assessments against policyholders and members. Taking JUA funds would decrease investment earnings which are important to the JUA's ability to meet operating costs and malpractice claims.
The retention of, and access to, large sums of capital is critical to the function of any insurance plan. As the United States Supreme Court has observed:
These pension plans, like other forms of insurance, depend on the accumulation of large sums to cover contingencies. The amounts set aside are determined by a painstaking assessment of the insurer's likely liability. Risks that the insurer foresees will be included in the calculation of liability, and the rates or contributions charged will reflect that calculation. The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect.
Allied Structural Steel, 438 U.S. at 246-47, 98 S.Ct. 2716 (quotation and brackets omitted).
*644 We note that it is not clear that the $110 million in fact represents excess surplus. However, whether some or all of the $110 million constitutes excess surplus is not dispositive of our analysis. Rather, the substantial character of the impairment flows, in part, from the fact that the Act contravenes the JUA board's contractual responsibility to its policyholdersthat is, to determine whether any excess surplus should be applied against future assessments or distributed to the policyholders.
In sum, we conclude that the Act substantially impairs the policyholders' contract rights because it effectively eliminates the participating character of the policies and divests the board of its obligation to treat any excess surplus funds for the policyholders' benefit.

B. Reasonable and Necessary Legislation
Because the Act substantially impairs the policyholders' contracts with the JUA, it technically violates Part I, Article 23 of the State Constitution. "Nevertheless, it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the [State's] police power. . . ." Furlough, 135 N.H. at 634, 609 A.2d 1204 (quotation omitted).
It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.
Allied Structural Steel, 438 U.S. at 241, 98 S.Ct. 2716 (quotation omitted).
"If the Contract Clause is to retain any meaning at all, however, it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." Id. at 242, 98 S.Ct. 2716 (emphasis omitted). "Thus, a balancing of the police power and the rights protected by the contract clauses must be performed, and a bill or law which substantially impairs a contractual obligation may pass constitutional muster only if it is reasonable and necessary to serve an important public purpose." Furlough, 135 N.H. at 634, 609 A.2d 1204 (quotation omitted). We "must consider whether the [State's] proposed justification in fact serves public interests and whether its mechanisms to serve those interests reflect reasonable and necessary choices." Mercado-Boneta, 125 F.3d at 15.
We first examine whether the law serves an important public purpose. The Act requires that the funds be used "for the purpose of supporting programs that promote access to needed health care for underserved persons." Laws 2009, 144:1, I. Protection of the health of the people of New Hampshire is certainly a legitimate and important goal. However, "the finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations." Keystone Bituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 505, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). "Although deference is due to the legislature, and weight is given to the legislature's own statement of purposes for the law, a court must undertake its own independent inquiry to determine the reasonableness *645 of the law and the importance of the purpose behind it." Mercado-Boneta, 125 F.3d at 13. Accordingly, we examine whether the Act, despite its substantial impairment of contract rights, is reasonable and necessary to accomplish the stated public purpose.
In assessing the reasonableness and necessity of the Act, the threshold question is the degree of deference we must afford the legislature's decision as to the means chosen to accomplish its purpose. The general rule is that, "[u]nless the State itself is a contracting party, `as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" Furlough, 135 N.H. at 634-35, 609 A.2d 1204 (quotation, brackets and ellipses omitted). This deference serves to ensure that the constitutional prohibition against the impairment of contracts does not prevent the State from legitimate exercises of police power "to protect the vital interests of its people." W.B. Worthen Co. v. Thomas, 292 U.S. 426, 432-33, 54 S.Ct. 816, 78 L.Ed. 1344 (1934). As the United States Supreme Court has noted, "The exercise of that reserved power has repeatedly been sustained by this Court as against a literalism in the construction of the contract clause which would make it destructive of the public interest by depriving the State of its prerogative of self-protection." Id. at 433, 54 S.Ct. 816. The Supreme Court has also held, however, that "this essential reserved power of the State must be construed in harmony with the fair intent of the constitutional limitation, and that this principle preclude[s] a construction which would permit the State to adopt as its policy . . . the destruction of contracts or the denial of means to enforce them." Id.
In cases where the State is itself a party to the contract, heightened review is warranted and courts generally accord minimal deference to legislative acts affecting such contracts. See, e.g., Lower Village, 147 N.H. at 78, 782 A.2d 897; see also Furlough, 135 N.H. at 635, 609 A.2d 1204 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." (quotation omitted)); National R. Passenger Corp. v. A.T. & S.F.R. Co., 470 U.S. 451, 472 n. 24, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) ("[T]he Court has observed that in order to maintain the credit of public debtors, and because the State's self-interest is at stake, the Government's impairment of its own obligations perhaps should be treated differently." (quotations and citations omitted)).
We make no ruling as to whether the policyholders' contracts with the JUA constitute State contracts. We note, however, that the State's underlying justification for transferring funds from the JUA to the general fund is based upon the State's assertion that "the JUA is part of the State." If we were to assume, for the purposes of analysis, that the JUA is part of the State, then the petitioners' participating policies would be public contracts. The Act, which interferes with those contracts, would therefore be subject to the heightened standard of review we applied in Furlough and Lower Village. We invalidated the legislation in those cases as unconstitutional, reasoning that "financial necessity, though superficially compelling, has never been sufficient of itself to permit states to abrogate contracts." Lower Village, 147 N.H. at 78, 782 A.2d 897 (brackets omitted) (quoting Furlough, 135 N.H. at 635, 609 A.2d 1204). Although "less deference does not imply no deference" to the legislature's determination of reasonableness *646 and necessity, Buffalo Teachers, 464 F.3d at 370, "[t]he [C]ontract [C]lause, if it is to mean anything, must prohibit the State from dishonoring its existing contractual obligations when other policy alternatives are available," Furlough, 135 N.H. at 635-36, 609 A.2d 1204 (quotation and brackets omitted). "If governments could reduce their financial obligations whenever an important public purpose could be conceived for repudiating a contract[,] the Contract Clause would provide no protection at all." Id. at 635, 609 A.2d 1204 (quotations omitted). If, as the State contends, the JUA is a part of the State, less deference to legislative judgment is warranted.
If, on the other hand, the JUA is a private entity, as found by the trial court, more deference is warranted, but complete deference is unsupportable. As we have previously held, "the [C]ontract [C]lause is not a dead letter and does impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." Smith Insurance, Inc. v. Grievance Committee, 120 N.H. 856, 863, 424 A.2d 816 (1980) (quotations omitted). For the Contract Clause to retain any vitality, we must be able to consider the reasonableness and necessity of the legislature's chosen action, particularly where the action's substantial impairment of contract rights inures to the State's financial benefit.
"[T]he absence of a contract with the state does not mean we thereby believe the [contract-impairing legislation] cannot be self-serving to the state. To the contrary, it can be." Buffalo Teachers, 464 F.3d at 370; see also Mercado-Boneta, 125 F.3d at 16 ("the real issue in determining the level of deference given to a legislative determination of reasonableness and necessity is not so much whether the state is arguably a nominal party to the contract, but whether the state is acting in its own pecuniary or self-interested capacity"). "The better rule therefore calls for focusing on whether the contract-impairing law is self-serving, where existence of a state contract is some indicia of self-interest, but the absence of a state contract does not lead to the converse conclusion." Buffalo Teachers, 464 F.3d at 370. Here, given the nature and effect of the Act, we conclude that the State's self-interest is at stake. Accordingly,
complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.
Furlough, 135 N.H. at 635, 609 A.2d 1204 (quotation omitted).
We note also that the United States Supreme Court has distinguished the deference accorded state, as opposed to federal, legislation:
When the court reviews state economic legislation the inquiry will not necessarily be the same [as a deferential review of federal economic legislation]. . . . [W]e have never held that the principles embodied in the Fifth Amendment's due process guarantee are coextensive with the prohibitions against state impairment of contracts under the Contract Clause, and, we observed, to the extent the standards differ, a less searching inquiry occurs in the review of federal economic legislation.
*647 National R. Passenger Corp., 470 U.S. at 472-73 n. 25, 105 S.Ct. 1441; see also Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1251 (3d Cir.1987) (contrasting "limitations imposed on States by the Contract Clause with the less searching standards imposed on [federal] economic legislation by the Due Process Clauses") (quotation and emphasis omitted). Thus, "[d]espite the customary deference courts give to state laws directed to social and economic problems, legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." Allied Structural Steel, 438 U.S. at 244, 98 S.Ct. 2716 (quotation and brackets omitted). Moreover, the State bears the burden of proving that the contract impairment is reasonable and necessary, since it asserts the benefit of its own statute. In re Seltzer, 104 F.3d 234, 236 (9th Cir.1996); see also Univ. of Hawaii Professional Assembly v. Cayetano, 183 F.3d 1096, 1106 (9th Cir.1999), injunction dissolved, 125 F.Supp.2d 1237, 1242-43 (D.Haw.2000).
While the Act's stated purpose is to provide funds to support "programs that promote access to needed health care for underserved persons," Laws 2009, 144:1, I, it does not constitute broad-based social or economic regulation directed to meet a societal need. Rather, the Act singularly targets for transfer to the State's general fund discrete funds generated by premiums paid by a discrete class of private parties. Compare Buffalo Teachers, 464 F.3d at 368-69 (upholding legislation imposing a generally applicable public employee wage freeze), with Ass'n of Sur. & Sup.Ct. Rptrs. v. State, 79 N.Y.2d 39, 580 N.Y.S.2d 153, 588 N.E.2d 51, 54 (1992) (striking down legislation as unconstitutional where it imposed a payroll lag upon a narrow class of State employees); see also Exxon Corp. v. Eagerton, 462 U.S. 176, 192, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983) (noting that the statute at issue in Allied Structural Steel applied so narrowly that "its sole effect was to alter contractual duties"); Allied Structural Steel, 438 U.S. at 247-49, 98 S.Ct. 2716. The Act's funding scheme is qualitatively different from social or economic regulatory legislation which establishes a broad-based mechanism for addressing a public need.
The State offers two justifications for the Act. First, the State contends that "[t]he Act furthers the public purpose of the JUA by avoiding distortions of the market that would inevitably flow from the distributions sought by petitioners," because such distributions have "the potential to disrupt the voluntary market by reducing the price of JUA insurance and creating an incentive for providers to move to the JUA." In rejecting the identical argument, the trial court observed:
This argument is based on the unwarranted assumption that if the State does not get the $110 million, the policyholders will . . . thus receiv[e] a "windfall." As the Court made clear at the outset of the . . . hearing, it has no authority, and will not attempt, to order any distribution of the surplus funds. Dividends can only be distributed pursuant to the procedures contained in the policy and regulations: by request of the JUA board and approval of the Commissioner.
We likewise reject this argument. What the policyholders stand to gain by our ruling is the enforcement of their contract rights to the application of any excess surplus for their benefit in one or both of the ways specified by the regulations incorporated into their policies. The question of whether the JUA board should make distributions of any excess surplus is not before us, and we express no opinion on that issue.
*648 Second, the State contends that the purpose of the Act is "much more than merely financial," asserting that the legislature "reasonably concluded that the excess surplus [in the JUA fund] would be more useful in promoting access to health care through state programs for the medically underserved than if the funds remained `trapped' in the JUA or were distributed to those providers that happen to be insured through the JUA."
Although funding state programs for the medically underserved is an important public purpose, we conclude that the Act is not appropriately tailored to serve that purpose. First, it is not clear that all of the $110 million is in fact "excess surplus." Although a risk-based capital estimate was prepared for the JUA, the JUA board made no determination as to the amount of any excess surplus. Under these circumstances, any assessment of the reasonableness of the amount subject to transfer is questionable. Further, the State has not suggested, and nothing in the record indicates, that the Act was precipitated by an emergency, or that it constitutes a temporary measure, with future reimbursement of the funds contemplated. See, e.g., Garris v. Hanover Ins. Co., 630 F.2d 1001, 1008 (4th Cir.1980) (in evaluating the reasonableness and necessity of challenged legislation, court examines: "(1) [the legislation's] emergency nature; (2) its purpose to protect a broad societal interest, not a favored group; (3) the tailoring of its remedial effect to its emergency cause; (4) the reasonableness of its basic features; and (5) its limited effect in temporal terms."). Nor does the record reflect that other avenues of funding, which do not substantially interfere with the policyholders' contracts, have been exhausted, or even considered. See Buffalo Teachers, 464 F.3d at 371 ("Only after . . . more drastic steps were taken and a finding that the freeze was essential was made, did the [governmental authority] institute the wage freeze."); Fraternal Order of Police, 645 F.Supp.2d at 510-18 (examining various factors to determine reasonableness and necessity, including "efforts to exhaust numerous alternatives before resorting to" legislation that substantially impaired a contract). Thus, we cannot conclude that the means chosen to accomplish the Act's stated purpose are reasonable and necessary.
Our conclusion rests upon the retroactive effect of the Act; if the legislature had addressed policyholders' rights prospectively that is, effective upon issuance of new policiesour analysis would of necessity be different. See Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 678. To be sure, the Act expediently accomplishes the legislature's stated purpose of supporting programs that promote access to needed health care. But such expediency does not, in and of itself, render the transfer of these funds reasonable and necessary. The legislature has other reasonable alternatives to accomplish its goal, including amending the rights and responsibilities under newly-issued JUA policies. As "there is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem[, t]he presumption favoring legislative judgment as to the necessity and reasonableness of a particular measure, simply cannot stand in this case." Allied Structural Steel, 438 U.S. at 247, 98 S.Ct. 2716 (quotation and citation omitted; emphasis added).

V. Conclusion
Because the Act substantially interferes with the current policyholders' contracts with the JUA, and is not reasonable and necessary to accomplish the legislature's stated public purpose, the Act constitutes a retrospective law that results in an impairment *649 of contract in violation of the New Hampshire Constitution and is, therefore, unenforceable. In view of this holding, we need not consider the merits of the former policyholders' claims, or the current policyholders' "takings" claim, the claims they assert derivatively on behalf of the JUA, or their claims under the Federal Constitution.
Affirmed.
BRODERICK, C.J., and HICKS, J., concurred; DALIANIS and DUGGAN, JJ., dissented.
DALIANIS and DUGGAN, JJ., dissenting.
The court today overturns a legislative decision to allocate $110 million to programs that promote access to needed health care for underserved persons and, instead, creates a potential $110 million windfall for the doctors, hospitals and other health care providers insured by the New Hampshire Medical Malpractice Joint Underwriting Association (JUA). Although one of the stated purposes of the JUA is to "promote the public interest in ensuring that consumers of health care services have adequate access to needed care," N.H. Admin. Rules, Ins 1701.01, and although the legislature has specifically found that this purpose "would be better served through a transfer of the excess surplus [in a certain JUA account] to the general fund," Laws 2009, 144:1, (the Act), the majority declines to defer to this legislative finding. Holding that only current policyholders with policies written on or after January 1, 1986 (policyholders) have a vested right in the surplus being used for their benefit, the majority concludes that the Act violates Part I, Article 23 of the State Constitution because it is a retrospective law that substantially impairs the policyholders' contractual rights. We respectfully believe that in so doing the majority errs.
First, the majority concludes that the policyholders have a vested right that is beneficial; it is well-established under New Hampshire law, however, that a beneficial right is not a vested right entitled to constitutional protection. Because the policyholders lack vested rights either to the surplus or to its use for their benefit, their constitutional claims must fail.
Second, even if we agreed with the majority that the Act in some way impaired the policyholders' insurance contracts, we believe that any impairment was insubstantial as a matter of law. The Act leaves intact the very purpose for which the policyholders entered into their contractsto obtain otherwise difficult or impossible to obtain coverage for medical malpractice claims. Moreover, there is no evidence that transferring $110 million from the JUA will in any way jeopardize its solvency. An actuarial study shows that, even without the $110 million, the JUA has more than enough assets to cover future claims.
Third, the majority subjects the Act to an unnecessarily stringent standard of review. When, as in this case, the State is not a party to a contract, this court is required to defer to the legislature's determination that a particular measure is reasonable and necessary to serve a legitimate public purpose. Instead, the majority makes its own de novo determination as to whether another alternative would have constituted a better solution to the problem at hand.
Fourth, this entire litigation may soon be moot and/or the petitioners may lack standing to bring it given the majority's holding that only petitioners with current JUA policies may assert Contract Clause claims. The record does not reveal whether any of the petitioners have current JUA *650 policies; thus, it is not clear whether any petitioner has standing to bring a Contract Clause claim. See University of Hawaii Prof. Assembly v. Cayetano, 125 F.Supp.2d 1237, 1240 (D.Haw.2000). Moreover, to the extent that the "current" policies were issued after the Act became effective, we believe that the petitioners with such policies cannot have a vested right to the excess surplus. Policies issued after the Act's effective date necessarily incorporate the Act's provisions. As to petitioners with such policies, the Act applies prospectively, not retrospectively.
In sum, we believe the majority misapplies settled New Hampshire law, ignores critical evidence in the record, and creates a new, expanded role for judicial review of economic legislation.

I. Part I, Article 23

A. In General
Part I, Article 23 of the State Constitution provides that "[r]etrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." We have held that Part I, Article 23 contains two prohibitions: the making of retrospective laws and the impairment of contractual rights. See State v. Fournier, 158 N.H. 214, 218, 221, 965 A.2d 1091 (2009). Although our case law has not always viewed them as such, see Opinion of the Justices (Furlough), 135 N.H. 625, 630, 609 A.2d 1204 (1992), the prohibition against retrospective laws and the prohibition against legislation that impairs contractual rights are analytically distinct. We believe that the majority errs by combining its analysis of whether the Act is a retrospective law with its analysis of whether the Act unconstitutionally impairs contractual rights.
A retrospective law is one that "takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." In re Grand Jury Subpoena (Issued July 10, 2006), 155 N.H. 557, 564, 926 A.2d 280 (2007) (quotation omitted). The other prohibition contained in Part I, Article 23 concerns impairment of contracts. This section of Part I, Article 23 "prohibit[s] the adoption of laws that would interfere with the contractual arrangements between private citizens." Id. (quotation, brackets and ellipsis omitted). Our State Constitution affords more protection than the Federal Constitution with respect to retrospective laws, and the same protection as the Federal Constitution with respect to contract impairment. See Fournier, 158 N.H. at 221, 965 A.2d 1091; Opinion of the Justices (Furlough), 135 N.H. at 630, 609 A.2d 1204.
Whether a vested right is impaired determines whether the law at issue operates retrospectively. It is not dispositive, however, of whether the law unconstitutionally impairs contractual rights. As will be discussed in more detail below, a law does not unconstitutionally impair contractual rights unless the impairment is substantial, the State lacks a significant and legitimate public purpose for it, and the adjustment of the contracting parties' rights and responsibilities is not based upon reasonable conditions and is not of a character appropriate to the public purpose justifying the law's adoption. Energy Reserves Group v. Kansas Power & Light, 459 U.S. 400, 411-12, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). Accordingly, we will analyze the two prohibitions contained in Part I, Article 23 separately.

B. Retrospective Law
The majority concludes that the Act "constitutes a retrospective law," but, in *651 our view, does not fully analyze this issue. In testing legislation against Part I, Article 23, we conduct a two-part analysis to determine if it is unconstitutionally retrospective. Fournier, 158 N.H. at 218, 965 A.2d 1091. First, we discern whether the legislature intended the law to apply retroactively. Id. "When the legislature is silent as to whether a statute should apply prospectively or retrospectively, our interpretation turns on whether the statute affects the parties' substantive or procedural rights. There is a presumption of prospectivity when a statute affects substantive rights." In re Estate of Sharek, 156 N.H. 28, 30, 930 A.2d 388 (2007) (quotation omitted). "Where the statute is remedial or procedural in nature, however, the presumption is reversed, and the statute is usually deemed to apply retroactively to those pending cases which on the effective date of the statute have not yet gone beyond the procedural stage to which the statute pertains." Appeal of Wal-Mart Stores, 145 N.H. 635, 638, 765 A.2d 168 (2000) (quotation omitted). "In the final analysis, however, the question of retrospective application rest[s] on a determination of fundamental fairness, because the underlying purpose of all legislation is to promote justice." Id. (quotation and brackets omitted).
If we find that the statute applies retroactively, we then inquire whether such retroactive application is constitutionally permissible. Fournier, 158 N.H. at 218, 965 A.2d 1091. This second inquiry concerns whether the legislation at issue impairs vested rights. See In re Estate of Sharek, 156 N.H. at 30, 930 A.2d 388. "Unless otherwise inhibited by either the State or Federal Constitutions, the Legislature may change existing laws, . . . statutory or common, at its pleasure, but in so doing, it may not deprive a person of a property right theretofore acquired under existing law." Id. (quotation omitted). "Those rights are designated as vested rights, and to be vested, a right must be more than a mere expectation based on an anticipation of the continuance of existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another." Id. (quotation omitted).
Rather than analyze the issue, the majority apparently assumes that the Act applies retroactively. Even if we were to agree, we believe that the policyholders have failed to establish that they have a vested right to any excess surplus. We believe that the pertinent regulations and insurance policies do not confer upon the policyholders a vested right either to the surplus itself or to its use for their benefit.
To determine the nature of the policyholders' right to the surplus, we first set forth the pertinent regulatory language. New Hampshire Administrative Rules, Ins 1703.07 governs the policies at issue in this case (those issued on or after January 1, 1986). In light of the majority's holding that only policyholders with current JUA policies may bring Contract Clause claims, for the purposes of our discussion, we will assume that the regulations currently in effect are incorporated into the policies at issue. To the extent that the majority suggests that the policyholders have a "vested" right in the law regulating their JUA contracts remaining unchanged, the majority is mistaken. "No person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit." Estabrook v. American Hoist & Derrick, Inc., 127 N.H. 162, 171, 498 A.2d 741 (1985) (quotation omitted), overruled on other grounds by Young v. Prevue Products, Inc., 130 N.H. 84, 88, 534 A.2d 714 (1987), and Thompson v. Forest, 136 N.H. 215, 219, 614 A.2d 1064 (1992); New York Cent. R.R. Co. v. White, *652 243 U.S. 188, 198, 37 S.Ct. 247, 61 L.Ed. 667 (1917).
Rule 1703.07(c) provides: "If premiums written on [JUA] business exceed the amount necessary to pay losses and expenses, the board shall apply such excess to repay [insurer] members for assessments previously levied, in proportion to the amount paid by each [insurer] member." See N.H. Admin. Rules, Ins 1702.01, 1703.01(b), (i). Rule 1703.07(d) provides:
If premiums . . . exceed the amount necessary to pay losses and expenses and to reimburse members for all assessments pursuant to Ins 1703.07(c), then with review and approval by the [Commissioner of the New Hampshire Insurance Department] as being consistent with the purposes of this chapter, the board shall authorize the application of such excess in one or both of the following ways:
(1) Against and to reduce future assessments of the [JUA]; or
(2) Distribute the excess to such health care providers covered by the [JUA] as is just and equitable.
We next set forth the policy language, which provides, in pertinent part: "The named insured shall participate in the earnings of the [JUA], to such extent and upon such conditions as shall be determined by the board of directors of the [JUA] in accordance with law and as made applicable to this policy. . . ."
The plain meaning of the regulatory and policy language demonstrates that the policyholders have no vested, enforceable right to any surplus amount. Under the regulation, the policyholders have a right to the surplus itself only if: (1) the board declares an excess; (2) the board decides that it need not retain the funds against and to reduce future assessments against insurer members; (3) the board decides to distribute the excess to the policyholders under such terms as are "just and equitable"; and (4) the insurance commissioner approves this distribution "as being consistent with the [regulatory] purposes" of the JUA. N.H. Admin. Rules, Ins 1703.07(d). Only if these contingencies occur, would the policyholders have a claim to the surplus. A contingent interest is, by definition, not a vested right, and, therefore, is not constitutionally protected. See In the Matter of Goldman & Elliott, 151 N.H. 770, 774, 868 A.2d 278 (2005).
Similarly, under the terms of the policy the policyholders "shall" participate in the JUA's earnings only "to such extent and upon such conditions as shall be determined" by the JUA's board "in accordance with law." The phrase "[t]he named insured shall participate" in the JUA's earnings is modified by the phrase "to such extent and upon such conditions" as the board may determine. In this context, the use of the word "shall" does not transform the policyholders' hopes for a future discretionary distribution into a "fixed, certain and absolute right" that the board must allow them to participate in the JUA's earnings. Id.
At best, the regulatory and policy language together confer upon the policyholders mere expectancies based upon "the anticipated continuance of the present laws, the existence of a . . . surplus," as well as the board's exercise of its discretion, with the commissioner's approval, to distribute the surplus to the policyholders. Butler Weldments v. Liberty Mut. Ins., 3 S.W.3d 654, 659 (Tex.Ct.App.1999). Mere expectancies are not vested rights as a matter of law. In the Matter of Goldman & Elliott, 151 N.H. at 774, 868 A.2d 278; see 2 N. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 41.6, at 456-57 (2009) ("The mere expectation of *653 a future benefit or contingent interest does not create a vested right.").
Perhaps to avoid this result, the majority holds that the regulatory and policy language "taken together confers upon the policyholders a vested contractual right in the treatment of any excess surplus." (Emphasis added.) The policyholders, the majority asserts, "have a vested right not necessarily in distribution of the funds, but in the treatment of the funds for their benefit." The majority explains that "the policyholders' vested rights are beneficial, rather than possessory. . . . [E]ither they benefit from the surplus by its reinvestment for application against future assessments; or they benefit from the surplus by receipt of a dividend."
We first observe that whatever benefit the policyholders would receive from the JUA's retention of the surplus is derivative. The "future assessments" to which the regulation refers are levied against insurers, not insureds. See N.H. Admin. Rules, Ins 1703.07, 1703.08, 1703.13. The primary beneficiaries of the JUA's decision to retain any surplus are, therefore, the JUA's member insurers, not the policyholders.
Additionally, we believe that the majority errs when it concludes that the policyholders' so-called "beneficial interest" in the surplus is entitled to constitutional protection under Part I, Article 23. Part I, Article 23 protects only vested rights. See In re Estate of Sharek, 156 N.H. at 30, 930 A.2d 388. By definition, a beneficial interest is not a vested right as a matter of law. See Nordic Inn Condo. Owners' Assoc. v. Ventullo, 151 N.H. 571, 575-76, 864 A.2d 1079 (2004); cf. Dubois v. Smith, 135 N.H. 50, 59, 599 A.2d 493 (1991) (noting that "beneficiary interest is not a vested property right"). To be vested, a right "must become a title, legal or equitable," and cannot be a "mere expecta[ncy]." In re Estate of Sharek, 156 N.H. at 30, 930 A.2d 388 (quotations omitted). A beneficial interest is only an expectancy and not legal title, and, therefore, is not a vested right. See Nordic Inn Condo. Owners' Assoc., 151 N.H. at 575-76, 864 A.2d 1079. Accordingly, a beneficial interest is not a vested right entitled to constitutional protection under Part I, Article 23. See In re Estate of Sharek, 156 N.H. at 31, 930 A.2d 388 (testator's right to name a beneficiary is no more vested than beneficiary's right to take under a will).
The majority concludes that the policyholders' "beneficial" rights are "vested" merely because they are contractual. The majority further concludes, without citation, that the policyholders' rights vested "upon issuance of their policies." To the contrary, not all rights created by contract are "vested," and, therefore, inviolable for the purposes of Part I, Article 23. See Hayes v. LeBlanc, 114 N.H. 141, 145, 316 A.2d 187 (1974) (Part I, Article 23's prohibition against retrospective laws "was not intended to prevent the legislature from amending laws which regulate contracts in the public interest where such laws have proven inadequate to accomplish their task.").
The United States Supreme Court "has long recognized that a statute does not violate the [Constitution] simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment. If the law were otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements." Exxon Corp. v. Eagerton, 462 U.S. 176, 190, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983) (citation and quotation omitted); see East New York Bank v. Hahn, 326 U.S. 230, 232, 66 S.Ct. 69, 90 L.Ed. 34 (1945). As Justice Holmes put it: "One whose rights, such as they *654 are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908); see Exxon Corp., 462 U.S. at 190, 103 S.Ct. 2296.
The majority relies upon Ohio State Life Insurance Co. v. Clark, 274 F.2d 771 (6th Cir.), cert. denied, 363 U.S. 828, 80 S.Ct. 1599, 4 L.Ed.2d 1523 (1960), and Alliance of American Insurers v. Chu, 77 N.Y.2d 573, 569 N.Y.S.2d 364, 571 N.E.2d 672 (1991), to support its contention that the policyholders' beneficial interests are entitled to constitutional protection. Both cases are inapposite. In Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 678, the issue of whether the policyholders had vested rights was undisputed. The court stated that because it was "not disputed" that had the State failed to give the contributors payment or credits attributable to their contribution, they "could have asserted a legitimate claim of entitlement to the moneys, grounded in the statutory guarantee." Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 678 (quotation and citation omitted).
Moreover, Chu is factually distinguishable from the instant case. In Chu, the relevant statutes mandated that income earned would be either returned to the contributors or credited toward their future contributions. Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 675. Here, whether the policyholders receive a distribution from the surplus is entirely at the discretion of the JUA's board of directors. See Methodist Hosp. of Brooklyn v. State Ins. Fund, 64 N.Y.2d 365, 486 N.Y.S.2d 905, 476 N.E.2d 304, 309, appeal dismissed, 474 U.S. 801, 106 S.Ct. 32, 88 L.Ed.2d 26 (1985).
Clark is also factually distinguishable. In that case, ownership of the surplus retained by a life insurance company, which primarily wrote policies on a mutual plan, but also wrote policies on a stock plan, was expressly granted to its policyholders. Clark, 274 F.2d at 773, 777. The company's charter stated that the company's surplus "shall belong to the holders of policies on the mutual plan and shall be apportioned and distributed on such equitable plan as the directors may provide." Id. at 777. Neither the JUA's governing regulations nor its insurance policies contain similarly unconditional language granting the policyholders ownership of the surplus.
The majority's entire discussion of vested rights is premised upon its assumption that the JUA operates like a mutual insurance company. However, the JUA is not a mutual insurance company. "[A] mutual company is owned by the policyholders." [1 Essentials of Insurance Law] New Appleman on Ins. L. Libr. Ed. (MB) § 1.08[4][c], at 1-83 (Oct.2009) (emphasis omitted). It "is organized and operated for the benefit of its policyholders who are by virtue of their policies members of the company," Methodist Hosp. of Brooklyn, 486 N.Y.S.2d 905, 476 N.E.2d at 308, and is "managed by people elected by the policyholders." Kelso & Irwin, P.A. v. State Ins. Fund, 134 Idaho 130, 997 P.2d 591, 596 (2000). In a mutual insurance company:
Each member pays a premium in advance, usually in an amount slightly larger than what is necessary to cover that individual's expected loss plus a fair share of administrative expenses. In lieu of paid-in capital to guarantee solvency, the mutual company relies on an accumulated surplus. Depending on the company's losses and expenses and the amount of investment income earned on the reserves, the company may refund a portion of the premium to the policyholder *655 at the end of the year in the form of a dividend. . . . Some mutuals . . . have the option to assess the members for sums (usually not exceeding the amount of the premium) necessary to cover unanticipated large losses.
New Appleman on Ins. L. Libr. Ed., supra § 1.08[4][c], at 1-83.
Unlike the policyholders of a mutual insurance company, the policyholders here are not members of the JUA and "have no vote or say in [its] administration." Methodist Hosp. of Brooklyn, 486 N.Y.S.2d 905, 476 N.E.2d at 308-09; see N.H. Admin. Rules, Ins 1702, 1703.04. The JUA is administered by a board whose members are appointed by the insurance commissioner, pursuant to regulations adopted by the commissioner. See N.H. Admin. Rules, Ins 1703.04(a) (board is comprised of seven voting members appointed by commissioner), 1703.04(p) (requiring JUA to invest premiums in certain manner), 1703.12 (providing that JUA "shall be subject to examination by the Commissioner" and requiring JUA to submit certain reports to same). Nor is there any evidence in the record that the policyholders paid slightly larger premiums so as to cover administrative expenses. While the JUA has some of the features of a mutual insurance carrier, there is no indication that the legislature intended it to be "owned" by its policyholders in the same way that a private mutual insurance company is owned by its policyholders. See Kelso & Irwin, P.A., 997 P.2d at 596.
The majority also places great weight on the fact that the insurance policies at issue describe themselves as "participating." The majority observes "that participating policies in other contexts have in common a policyholder's entitlement to share in the company's excess surplus." See, e.g., Gulf Life Ins. Co. v. United States, 35 Fed. Cl. 12, 13 (1996) ("[A] participating policy has a higher stated premium than the nonparticipating policy for the same insurance, but the policyholder expects to receive premium rebates in the form of policyholder dividends. These dividends are returned to policyholders based on the company's experience or the discretion of its management."), aff'd, 118 F.3d 1563 (Fed. Cir.1997). The JUA policies, however, are not "participating" simply because they say they are. See Concord Hosp. v. N.H. Medical Malpractice Joint Underwriting Assoc., 137 N.H. 680, 683, 633 A.2d 1384 (1993). Moreover, nothing in the record demonstrates that the policyholders have paid higher premiums than they would have paid for non-JUA insurance.
Because the policyholders have failed to establish a vested, constitutionally protected right either to the surplus itself or to its use for their benefit, the Act does not violate Part I, Article 23's prohibition against retrospective laws. Having concluded that the Act is not an unconstitutional retrospective law, we next analyze whether it otherwise violates Part I, Article 23 because it substantially impairs the policyholders' contractual rights.

B. Contract Impairment
"[T]he general purpose of the [Contract] Clause [is] clear: to encourage trade and credit by promoting confidence in the stability of contractual obligations. Nevertheless, a State continues to possess authority to safeguard the vital interests of its people. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of [the United States Supreme] Court." United States Trust Co. v. New Jersey, 431 U.S. 1, 15, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (quotation, citation and ellipsis omitted). Accordingly, resolving a Contract Clause claim entails "reconcil[ing] the *656 strictures of the Contract Clause with the essential attributes of sovereign power, necessarily reserved by the States to safeguard the welfare of their citizens." Id. at 21, 97 S.Ct. 1505 (quotation and citation omitted). Although the language of the Federal and State Contract Clauses is "facially absolute, [their] prohibition[s] must be accommodated to the inherent police power of the State." Energy Reserves Group, 459 U.S. at 410, 103 S.Ct. 697. The Contract Clause's prohibition "is not. . . the Draconian provision that its words might seem to imply," Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), and "does not trump the police power of a state to protect the general welfare of its citizens, a power which is paramount to any rights under contracts between individuals." Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 367 (2d Cir.2006) (quotation omitted), cert. denied, 550 U.S. 918, 127 S.Ct. 2133, 167 L.Ed.2d 864 (2007).
We employ a three-step analysis when determining whether legislation constitutes an impairment of contract. See Fournier, 158 N.H. at 221, 965 A.2d 1091. The first step is to analyze whether the law has operated as a substantial impairment of a contractual relationship. General Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). If the impairment is minimal, then it does not rise to a constitutional violation and our inquiry is at an end. Allied Structural Steel Co., 438 U.S. at 244, 98 S.Ct. 2716. If, however, we find substantial impairment, the next step is to determine whether "the State in justification, . . . [has] a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." Energy Reserves Group, 459 U.S. at 411-12, 103 S.Ct. 697 (citation omitted). The third step is to determine "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." Id. at 412, 103 S.Ct. 697 (quotation and brackets omitted).

1. Substantial Impairment
We first examine whether the Act substantially impairs the policyholders' contractual rights. "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Romein, 503 U.S. at 186, 112 S.Ct. 1105; see Fournier, 158 N.H. at 221, 965 A.2d 1091; Lower Village Hydroelectric Assocs. v. City of Claremont, 147 N.H. 73, 77, 782 A.2d 897 (2001).
The parties do not dispute the existence of a contract for professional liability insurance. Further, we assume, arguendo, that the majority correctly concludes that the Act impairs the contract. We disagree, however, that the policyholders have met their burden in proving that the impairment is substantial.
In the few opportunities we have had to consider whether a law substantially impairs a contract, we have examined: (1) the nature of the contract and the affected contractual terms; (2) the degree to which the parties reasonably relied upon those terms at the time they formed the contract; and (3) the practical effect the challenged law would have upon parties. See Lower Village Hydroelectric Assocs., 147 N.H. at 77, 782 A.2d 897; Opinion of the Justices (Furlough), 135 N.H. at 633-34, 609 A.2d 1204; Smith Insurance, Inc. v. Grievance Committee, 120 N.H. 856, 863, 424 A.2d 816 (1980); accord Mobil Oil Corp. v. Rossi, 138 Cal.App.3d 256, 187 Cal.Rptr. 845, 850 (1982) ("[S]pecific factors *657 which may be important in gauging the severity of impairment include the nature and significance of the right impaired,. . . whether the parties have relied on the preexisting contract right and the extent to which the statute violates the reasonable expectations of the parties; whether the law is temporary or indefinite in duration and whether the legislation is in a previously regulated area." (citations omitted)). For example, in holding that a law mandating forced unpaid leave for state employees substantially impaired employment contracts, we stated: "The bill under consideration here impairs the very heart of an employment contract: the promise of certain work for certain income. Its impact would likely wreak havoc on the finances of many of the affected workers and can only be considered substantial." Opinion of the Justices (Furlough), 135 N.H. at 634, 609 A.2d 1204. Contrary to the policyholders' assertions, the amount of money the Act seeks to transfer from the JUA to the general fund is not sufficient, by itself, to establish that impairment of the contract was substantial, and, accordingly, unconstitutional.
Although courts have not precisely defined what constitutes substantial impairment, see Coleman & Darden, The Constitutionality of Retroactive Franchise Laws, 21 Franchise L.J. 13, 14 (2001); Baltimore Tchrs. Un. v. Mayor, Etc., of Baltimore, 6 F.3d 1012, 1017 (4th Cir.1993), cert. denied, 510 U.S. 1141, 114 S.ct. 1127, 127 L.Ed.2d 435 (1994), they agree that the impairment need not necessarily "[t]otal[ly] destr[oy] . . . contractual expectations" to be considered substantial. Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. 697. "[S]tate regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." Id. Along similar lines, New Hampshire and other jurisdictions have held that an impairment is substantial when a statute affects the right to compensation in employment contracts or when it impairs a party's right to terminate a contract pursuant to its terms. See, e.g., Equipment Mfrs. Institute v. Janklow, 300 F.3d 842, 855-56 (8th Cir.2002); Baltimore Tchrs. Un., 6 F.3d at 1018; Fraternal Order of Police v. Prince George's Cty., 645 F.Supp.2d 492, 510 (D.Md.2009) ("Certainly, in the employment context, no right is more central to the contract's inducement than the right to compensation at the contractually specified level." (quotation, ellipses, and brackets omitted)); Kendall-Jackson Winery, Ltd. v. Branson, 82 F.Supp.2d 844, 873 (N.D.Ill.2000); Opinion of the Justices (Furlough), 135 N.H. at 634, 609 A.2d 1204; Grievance Committee, 120 N.H. at 863, 424 A.2d 816.
Courts have placed great weight upon the second consideration noted above: the degree to which the parties reasonably relied upon the impaired terms at the time they formed the contract, or put another way, their reasonable expectations. See, e.g., Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 190 (1st Cir. 1999) ("In order to weigh the substantiality of a contractual impairment, courts look long and hard at the reasonable expectations of the parties."); Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 53 (2d Cir.) ("[T]he primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted."), cert. denied, 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 230 (1998); Fraternal Order of Police, 645 F.Supp.2d at 510 ("[W]here the right abridged was one that induced the parties to contract in the first place, a court can assume the impairment to be substantial." (quotation omitted)).
*658 The majority acknowledges that evidence of a party's reliance upon the impaired contractual term is relevant in determining whether the impairment is substantial. It conducts no analysis, however, to determine whether, and to what degree, the policyholders may have relied upon the participating provision of the policy in contracting with the JUA for professional liability insurance. Instead, the majority simply quotes the trial court's ruling that "[t]he JUA has offered an assessable and participating policy approved by the Commissioner since its inception with no hint in the record that anyone had ever intended otherwise." It then concludes that, because the State does not "contest this ruling," or "contend that any factual dispute exists," or "assert on appeal that the policyholders did not rely upon the participating nature of the policies[,] . . . whether any particular policyholders relied upon the participating nature of the policies is not relevant to our analysis."
Perhaps the reason that the majority avoids this issue is that, in this case, the policyholders do not even attempt to argue that they relied upon the impaired provision when contracting with the JUA for professional liability insurance. Indeed, their own statement runs contrary to establishing reliance. The affidavit of Thomas Buchanan, Chief Executive Officer of policyholder Derry Medical Center, submitted with the policyholders' opposition to the respondents' summary judgment motion, concedes that "Derry Medical was constrained to do business with [the JUA], not because of the prospect of a return of surplus, but because the commercial carriers were not interested in selling coverage to our practice due to the greater risk they perceived in insuring a larger primary care provider with typical claims history." In other words, when contracting for insurance, the policyholders had no choice but to contract with the JUA, and were not in a bargaining position to choose a plan based upon any features other than liability coverage, including whether the plan contained the opportunity for surplus distribution.
Moreover, proving reliance upon a term affected by a change in law necessarily requires that the facts arising under the contract term and its impairment were foreseeable. Assuming, arguendo, the foreseeability of a surplus, it would not be reasonably foreseeable that any surplus would be distributed given that the disposition of surplus is subject to approval by the commissioner, see N.H. Admin. Rules, Ins 1703.07(d), the JUA's last request for distribution was denied in 2001, and no distributions have been requested since. Indeed, in the thirty-four years since the JUA was created, distributions to policyholders have only been made twice, in 1999 and 2000.
Even if we were to find that the policyholders relied upon the impaired provision, any reliance would be unreasonable because the JUA is part of a highly-regulated industry and is a creature of state regulation. Whether reliance is reasonable is greatly influenced by "whether the industry the complaining party has entered has been regulated in the past." Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. 697. This is because "[w]hen regulation already exists, it is foreseeable that changes in the law may alter contractual obligations," thereby making it unreasonable to expect that the law would remain unchanged. Kittery Retail Ventures v. Town of Kittery, 856 A.2d 1183, 1195 (Me.2004), cert. denied, 544 U.S. 906, 125 S.Ct. 1603, 161 L.Ed.2d 279 (2005). "Of great, and we are inclined to say controlling, importance in the determination of whether a law violates the contracts clause is the foreseeability of the law when the *659 original contract was made." Chrysler Corp. v. Kolosso Auto Sales, Inc., 148 F.3d 892, 894-95 (7th Cir.1998), cert. denied, 525 U.S. 1177, 119 S.Ct. 1113, 143 L.Ed.2d 109 (1999). This is because "what was foreseeable then will have been taken into account in the negotiations over the terms of the contract." Id.
It is well-established that "[i]nsurance has long been a heavily regulated industry." Jost, Health Insurance Exchanges: Legal Issues, 37 J.L. Med. & Ethics 53, 56 (2009); see Brown, Constitutional Limits on State Insurance Regulation, 29 Tort & Ins. L.J. 651, 652 (1994); Mercado-Boneta v. Admin. del Fondo de Compensacion, 125 F.3d 9, 13-14 (1st Cir.1997). In New Hampshire specifically, the JUA was established in 1975 by the insurance commissioner, pursuant to his authority under RSA 404-C:1 (2006) "to provide such insurance coverage for any risks in this state which are equitably entitled to but otherwise unable to obtain such coverage." It is a State-created entity, and its operations are controlled by regulations promulgated by the insurance commissioner. All this is to say that, not only is the JUA part of the highly-regulated insurance industry, it is a creature of state regulation itself and would not exist but for the regulation that created it. Thus, in light of the State's pervasive and longstanding regulation, the legislative act at issue here was by no means unforeseeable. Accordingly, to the extent that the policyholders argue that they relied upon the law relevant to the disposition of the JUA's funds, beyond those that are necessary to cover their claims, any such reliance is, without question, unreasonable. Accord Veix v. Sixth Ward Assn., 310 U.S. 32, 38, 60 S.Ct. 792, 84 L.Ed. 1061 (1940) (When a party "purchase[s] into an enterprise already regulated in the particular to which he now objects, he purchase[s] subject to further legislation upon the same topic."); Blue Cross/Blue Shield of Rhode Island v. Rhode Island Dept. of Bus. Reg., No. 04-5769, 2005 WL 1530449, at *7-8 (R.I.Super. June 23, 2005) (finding no substantial impairment even though statute at issue "totally deprive[d] [non-profit corporation's] Directors of all compensation" in part because the non-profit was "a creature of special legislation in an industry that is extensively regulated").
The majority concedes that a history of regulation in the industry is one factor courts consider in determining whether impairment is substantial and that insurance is, in fact, a heavily-regulated industry. It fails, however, to apply this factor in determining whether the insurance industry's history of regulation has any impact on the reasonableness of the policyholders' purported reliance on the impaired contract term. Instead, it concludes only that "[t]he simple fact that insurance is a heavily regulated industry does not preclude a conclusion that the Act substantially impairs the policyholders' vested contract rights to share in the JUA earnings."
In reading the majority's analysis, one might conclude that the Contract Clause mandates that contracts between parties be governed by the statutes and regulations in effect at their formation unless the legislature expressly reserves the authority to change the applicable law. Such a conclusion is contradicted by well-settled precedent. See Bowen v. Agencies Opposed to Soc. Sec. Entrap., 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (noting that the State does not "waive[ ] the right to exercise one of its sovereign powers" if it fails to "expressly reserve[ ] the right to exercise that power. . . . [S]overeign power, even when unexercised, is an enduring presence that governs all contracts[,]. . . and will remain intact unless surrendered in unmistakable terms." (quotations *660 and citations omitted)); see also Hayes, 114 N.H. at 145, 316 A.2d 187.
The majority's reliance upon paragraph eight in the JUA policies is particularly misplaced. Paragraph 8 provides:
Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy . . .; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized representative of the company.
This paragraph defines the responsibilities of the JUA and its insured; it has no bearing whatsoever upon the commissioner's regulatory authority or the power of the legislature to amend laws regulating contracts. See Hayes, 114 N.H. at 145, 316 A.2d 187.
We observe also that, relevant to the third considerationthe practical effect the challenged law would have upon parties the record reflects that removing $110 million from the fund would have no practical effect upon the ability of the JUA to cover future policyholder claims. While the majority suggests that the surplus could be required to protect the JUA from insolvency, stating that "it is not clear that the $110 million in fact represents excess surplus," this proposition is squarely contradicted by the record. As the majority acknowledges, the record shows that the Department contracted with an independent actuarial consulting firm that produced a detailed report estimating the JUA's risk-based capital levels for 2009 through 2013. Risk-based capital is a method developed by the National Association of Insurance Commissioners to measure the amount of capital that an insurance company needs to support its overall business operations. To develop a range of risk-based capital levels for the years 2009 through 2013, the actuarial firm modeled four different scenarios reflecting different levels of anticipated JUA premium volume. The premium volume assumptions ranged from the JUA continuing to grow modestly, with five percent annual growth, to it having to expand its writings significantly because one or more carriers departed from the New Hampshire market. With the premium assumptions and other assumptions in place, the firm created a financial projection model that calculated expected financial results. Based upon this report, the Department determined that even after the $110 million is transferred to the general fund over a three-year period, the JUA will remain as well-capitalized as private insurers writing medical malpractice insurance in New Hampshire, at a risk-based capital level more than three times that of the industry minimum.
Moreover, given that the majority holds that only current policyholders have rights at stake, the solvency issue is not whether the JUA will be solvent in three years or later, as the majority appears to state, but whether the JUA will become insolvent during the term of the current policyholders' contracts. The record submitted on appeal reveals that these contracts lasted for only one year, and may have expired while this litigation was pending. Given the limited period during which the policyholders have any rights, the majority's concern regarding potential insolvency appears to be ephemeral.
We note that the impairment of contract in this case is unlike that at issue in Lower Village Hydroelectric Associates. That case concerned the retroactive repeal of a statute that had permitted qualifying businesses to negotiate payment-in-lieu-of-taxes (PILOT) agreements with the cities and towns in which they were located. Lower Village Hydroelectric Assocs., 147 N.H. at *661 74, 782 A.2d 897. The purpose of the statute was to encourage the propagation of local small power production and cogeneration facilities. Id. Pursuant to the statute, Lower Village Hydroelectric Associates, L.P. (LVHA) negotiated a PILOT agreement with Claremont under which it would pay 2.5% of gross revenues from 1997 to 2004 and 5% of gross revenues from 2005 to 2011. Id. Before the agreement was finalized and before the first payment had been tendered by LVHA, the statute permitting the PILOT agreements was repealed with a retroactive effective date. Id. The city, believing it was not bound by its agreement, assessed LVHA's facility $46,338.24 in ad valorem taxes, instead of $6,570.61, the amount that would have been due under the PILOT agreement. Id. at 75, 782 A.2d 897. Finding that there was a binding contract in effect, we held that the repeal of the statute was a retrospective law in violation of Part I, Article 23 of the New Hampshire Constitution. Id. at 75-77, 782 A.2d 897. Specifically, we stated that the law "nullified the PILOT agreement," and that, accordingly, "there can be no question that the contract. . . was substantially impaired." Id. at 77, 782 A.2d 897.
The retrospective law at issue in Lower Village Hydroelectric Associates totally destroyed LVHA's contractual expectations. LVHA contracted for a particular PILOT for a period of fourteen future tax years, presumably relying upon that reduced tax burden as it structured its business. Id. at 74-75, 77, 782 A.2d 897. The repeal of the law permitting the contract abridged a right "that induced the parties to contract in the first place," and, accordingly, we correctly "assume[d] the impairment to be substantial." Fraternal Order of Police, 645 F.Supp.2d at 510 (quotation omitted). Consistent with our holding in Opinion of the Justices (Furlough), where we also found substantial impairment, the repeal of the statute "impair[ed] the very heart" of LVHA's contract and "[i]ts impact would [have] likely wreak[ed] havoc on [LVHA's] finances." Opinion of the Justices (Furlough), 135 N.H. at 634, 609 A.2d 1204.
By contrast, there is no indication in the record that the right to a distribution of surplus induced the policyholders to contract for professional liability insurance with the JUA. The "very heart" of the contract at issue in this case is financial protection from professional liability in the amount contracted for, and there is nothing in the record indicating that transfer of the surplus to the general fund would affect the policyholders' finances, let alone "wreak havoc" on them. Id. The transfer of the surplus simply "restricts [the policyholders] to gains [they] reasonably expected from the contract," and, accordingly, there is no substantial impairment. Energy Reserves Group, 459 U.S. at 411, 103 S.Ct. 697.

2. Legitimate Public Purpose
Because there is no substantial impairment, there is no constitutional violation, and we could here end our inquiry. See Allied Structural Steel, 438 U.S. at 244, 98 S.Ct. 2716. However, even if we were to assume that the impairment is substantial, consideration of the remaining steps in the three-step analysis would still lead us to conclude that there is no constitutional violation.
The second step is to determine whether the State has established a legitimate public purpose for the Act. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." Energy Reserves Group, 459 U.S. at 412, 103 S.Ct. 697. The majority concedes, as it must, that the purpose *662 of the Act, which is to support programs that promote access to needed health care for underserved persons, is a "legitimate and important goal." We agree. An additional legitimate public purpose is to eliminate a potential unforeseen windfall to the JUA's insureds. See id. (observing that "[o]ne legitimate state interest is the elimination of unforeseen windfall profits").

3. Whether Legislation is Reasonable and Necessary
Finally, we determine whether the legislation is reasonable and necessary to achieve the legislature's legitimate public purpose. "Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Id. at 412-13, 103 S.Ct. 697 (quotation, citation, brackets and ellipsis omitted); see Opinion of the Justices (Furlough), 135 N.H. at 634-35, 609 A.2d 1204. "If the state is a party to the contract, such deference is inappropriate, and the court may inquire whether a less drastic alteration of contract rights could achieve the same purpose and whether the law is reasonable in light of changed circumstances." Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1243 (3d Cir.), cert. denied, 484 U.S. 963, 108 S.Ct. 452, 98 L.Ed.2d 392 (1987); see United States Trust Co., 431 U.S. at 25-26, 30-32, 97 S.Ct. 1505.
In this case, because the State is not a party to the agreements between the JUA and the policyholders, we must defer to the legislature's judgment that the Act is reasonable and necessary to achieve its legitimate public purpose. See Lower Village Hydroelectric Assocs., 147 N.H. at 78, 782 A.2d 897. Contrary to the majority's assertions, this does not mean that we give the legislature "complete deference," but rather that we examine whether the adjustment of contract rights is reasonable and appropriate to the public purpose underlying the Act. See Keystone Bituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 505, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (holding that "the finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations"; rather, the court "must also satisfy itself that the legislature's adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption" (quotations and brackets omitted)).
In analyzing the reasonableness of the legislation, courts have focused upon such as factors as whether: (1) the law meets an emergency need; (2) the law was enacted to protect a basic societal interest, rather than a favored group; (3) the law is appropriately tailored to the targeted emergency; (4) whether the imposed conditions are reasonable; and (5) whether the law is limited to the duration of the emergency. See Home Bldg. & L. Assn. v. Blaisdell, 290 U.S. 398, 444-47, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Ken Moorhead Oil Co., Inc. v. Federated Mut. Ins., 323 S.C. 532, 476 S.E.2d 481, 488-89 (S.C. 1996); Kimball v. N.H. Bd. of Accountancy, 118 N.H. 567, 570, 391 A.2d 888 (1978). An emergency need not exist, however, before a state may enact a law that impairs a private contract. See Energy Reserves Group, 459 U.S. at 412, 103 S.Ct. 697 (observing that, to be legitimate, "the public purpose need not be addressed to an emergency or temporary situation"); Allied Structural Steel, 438 U.S. at 249 n. 24, 98 S.Ct. 2716.
In our opinion, the Act easily survives scrutiny under this deferential standard. The Act was passed to protect a basic *663 societal interestaffordable healthcare for underserved populations. "The protection of public health . . . serves broad societal interests, not merely some `favored' special interest group." Ken Moorhead Oil, 476 S.E.2d at 489.
In our view, the Act is a reasonable decision by the legislature that it can better meet this need by transferring funds to programs that provide such access instead of retaining them in the JUA's coffers. The legislature has determined that the funds held by the JUA in its account "are significantly in excess of the amount reasonably required to support its obligations as determined by the insurance commissioner." Laws 2009, 144:1. This determination is supported by evidence in the record, which includes an actuarial study that shows that the transfer will not jeopardize the JUA's solvency. The legislature has further determined that "the purpose of promoting access to needed health care would be better served through a transfer of the excess surplus . . . to the general fund," than by retaining the funds in the JUA's account. Id. As the majority concedes, "the Act expediently accomplishes the legislature's stated purpose."
Additionally, in our view, the State's adjustment of the policyholders' contractual rights (to the extent that any has occurred) to allow for the transfer of funds from the JUA to the general fund to support programs that provide access to healthcare serves this public purpose. Particularly given the actuarial study showing that transfer of the funds would in no way jeopardize the JUA's solvency, we believe that the State has reasonably adjusted the policyholders' contractual rights. Accordingly, we conclude that the impairment of the policyholders' contractual rights, to the extent that any has occurred, is amply justified by the public purposes served by the Act, and also that the legislature has reasonably adjusted the contract rights at issue. See Keystone Bituminous Coal Assn., 480 U.S. at 505, 107 S.Ct. 1232.
Although "[c]ourts are required to defer to the legislature's judgment concerning the necessity and reasonableness of economic and social legislation," the majority declines to do so. Nieves, 819 F.2d at 1249 (emphasis added). The majority contends that substantial judicial deference is unwarranted because the Act transfers money from the JUA to the general fund. But see Mercado-Boneta, 125 F.3d at 16 n. 8 (noting, "even where public contracts are at issue, some deference is due a legislature"); Local Div. 589, Etc. v. Comm. of Mass., 666 F.2d 618, 642 (1st Cir.1981) (even where public contracts are involved, courts are not required to "reexamine de novo all the factors underlying the legislation and to make a totally independent determination" regarding the necessity and reasonableness of the law), cert. denied, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); but cf. United States Trust Co., 431 U.S. at 25, 97 S.Ct. 1505 (holding, "[t]he Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations"). This transfer to the general fund, the majority reasons, is not "broad-based social or economic regulation directed to meet a societal need," but a sign that the State's self-interest is at stake, thus, justifying reviewing the Act under a heightened standard.
In our view, the majority's reasoning is flawed in several respects. First, we fail to see how an act designed to support programs that promote public access to health care is not "broad-based social or economic regulation directed to meet a societal need." The legislature's justification for the Act, to support health care programs for underserved populations, *664 serves public interests. It stands "in stark contrast to the narrowly focused, private interest-oriented law" that the United States Supreme Court struck down in Allied Structural Steel, 438 U.S. at 248-49, 98 S.Ct. 2716. Mercado-Boneta, 125 F.3d at 15. The law at issue in Allied Structural Steel applied only to certain private employers with voluntary private pension plans and only when such employers closed their Minnesota offices or terminated their pension plans. Allied Structural Steel, 438 U.S. at 248, 98 S.Ct. 2716. As such, the law had an "extremely narrow focus" and was not enacted "to protect a broad societal interest rather than a narrow class." Id. at 248, 249, 98 S.Ct. 2716. By contrast, here, the State "was not legislating on behalf of private interests when it enacted [the Act], and sought only to protect the legitimate interests of the public" in having affordable health care. Mercado-Boneta, 125 F.3d at 15.
The majority concludes that the Act is not broad-based social or economic regulatory legislation because of its "funding scheme," which the majority describes as "singularly target[ing] for transfer to the State's general fund discrete funds generated by premiums paid by a discrete class of private parties." Regardless of its funding mechanism, the Act constitutes broad-based social or economic legislation because it was enacted "to protect a broad societal interest rather than a narrow class." Allied Structural Steel, 438 U.S. at 249, 98 S.Ct. 2716.
Moreover, the record refutes the majority's assertion that the funds were "generated by premiums paid by a discrete class of private parties." According to the deputy commissioner of the insurance department, while the excess surplus has resulted, in part, from the accumulation of premiums, it has also resulted from the accumulation of "investment income free of taxes and assessments paid by private insurers." The JUA is exempt from federal income tax and New Hampshire premium tax. It is also exempt from and has never paid the New Hampshire business profits tax, business enterprise tax, and the interest and dividends tax. It is also exempt from assessments levied upon private insurers that fund the insurance department.
Second, we believe that the majority construes the term "self-interest" too broadly. Under the majority's construction of the term, "virtually every state statute that impairs a purely private contract would be subject to heightened scrutiny." Ken Moorhead Oil Co., 476 S.E.2d at 488. "Presumably, every state statute is intended to serve [the State's] self-interest; otherwise the General [Court] would not enact the legislation in the first place." Id. The self-interest to which the United States Supreme Court has referred "is the state's interest as a party to a contract, rather than to its interests as a sovereign seeking to further important public policies." Id.; see Keystone Bituminous Coal Assn., 480 U.S. at 505, 107 S.Ct. 1232 (United States Supreme Court "has repeatedly held that unless the State is itself a contracting party, courts should properly defer" to the legislature's judgment (quotation omitted)); Peick v. Pension Ben. Guar. Corp., 724 F.2d 1247, 1270 (7th Cir. 1983) (holding that there is "no merit" to the argument that heightened scrutiny applies to legislative impairment of private contracts; such scrutiny applies only when the State is a contracting party), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); Lower Village Hydroelectric Assocs., 147 N.H. at 78, 782 A.2d 897 (judicial deference required unless State is contracting party). When, as in this case, "the state has in fact altered none of its own financial obligations," then the legislature's assessment of whether the *665 legislation is reasonable and necessary "deserves significant deference because the state is essentially acting not according to its economic interests, but pursuant to its police powers." Mercado-Boneta, 125 F.3d at 16 (emphasis added).
We disagree with the majority's conclusion that the Act "inures to the State's financial benefit." Unlike the majority, we give credence to the fact that the Act specifically earmarks the transferred funds to support programs that provide underserved populations with access to needed healthcare. Under such a scheme, "it [is] the public welfare, not the [State's] bank account, that [stands] to [gain]." Id. Contrary to the majority's implication, there is no evidence in the record that the legislature enacted the Act because of "an ill-motive of political expediency or unjustified welching." Buffalo Teachers, 464 F.3d at 373.
Third, even if a heightened standard of review were justified in this case, we disagree with the majority's application of this standard. "[L]ess deference does not imply no deference." Id. at 370. Even when the State's purported self-interest is at stake, courts are not required "to reexamine all of the factors underlying the legislation at issue and to make a de novo determination whether another alternative would have constituted a better statutory solution to a given problem." Id.; see Local Div. 589, Etc., 666 F.2d at 642. "Nor is the heightened scrutiny to be applied as exacting as that commonly understood as strict scrutiny." Buffalo Teachers, 464 F.3d at 371.
Finally, today's decision leaves a number of unresolved issues, including:
 What now becomes of the $110 million surplus?
 If it is to be distributed "to such health care providers covered by the [JUA]," does that include both current and past policyholders, even if, as the majority holds, only "current policyholders" have viable Contract Clause claims?
 Once the policyholders' policies expire, does their supposed vested right to the $110 million surplus also expire? If so, does this mean that, as the majority suggests, if new legislation were passed that became effective upon issuance of the policyholders' new policies, the legislature could require the JUA to transfer the $110 million surplus without violating the policyholders' constitutional rights?
 What effect will this decision have on the JUA's exemption from both State and Federal taxes?
 If it is distributed to policyholders, what impact will this have on the private medical malpractice insurance market in New Hampshire?

III. Part I, Article 12
Our determination that the policyholders lack vested rights to the surplus itself or to its use for their benefit is dispositive of their claim that the Act constitutes a "taking." The New Hampshire Constitution provides that "no part of a man's property shall be taken from him . . . without his own consent." N.H. CONST. pt. I, art. 12. In the absence of a vested property right, no taking for purposes of Part I, Article 12 of the State Constitution has occurred. See Adams v. Bradshaw, 135 N.H. 7, 14, 599 A.2d 481 (1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1560, 118 L.Ed.2d 208 (1992). Accordingly, because the policyholders lack vested rights, the Act does not operate as a "taking" for the purposes of Part I, Article 12.

IV. Conclusion
We believe that the majority's conclusion that the Act violates Part I, Article 23 *666 of the State Constitution is erroneous as a matter of law. We also believe that by failing to defer to the legislature's judgment that the Act is a reasonable and necessary measure to further an indisputably legitimate public purpose, the majority encroaches upon legislative decision-making.
"If there is one rule that is now ingrained in the doctrine of judicial review of legislative enactments it is this: that an act of the Legislature is presumed to be constitutional and may be struck down only when it is proven to be unconstitutional beyond a reasonable doubt." Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 690 (Hancock, J., dissenting); see N.H. Assoc. of Counties v. State of N.H., 158 N.H. 284, 288, 965 A.2d 1012 (2009). "Particularly since the Supreme Court's abandonment of the Lochner [v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905)] era concept of economic due process as a justification for striking down regulatory legislation, courts have been mindful of this rule in recognition of the basic principle that under the doctrine of separation of powers, it is to their elected representatives, not to the members of the judiciary that the citizens have delegated the power to make the law." Chu, 569 N.Y.S.2d 364, 571 N.E.2d at 690 (Hancock, J., dissenting) (citation omitted); see Appeal of Bosselait, 130 N.H. 604, 613, 547 A.2d 682 (1988) (observing, "legislation merely regulating economic benefits and burdens . . . is reviewable under the rational basis criterion when challenged . . . under the due process clause"), cert. denied, 488 U.S. 1011, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989); Petition of Kilton, 156 N.H. 632, 645, 939 A.2d 198 (2007) (noting, "[m]atters of public policy are reserved for the legislature"). The majority's opinion is contrary to the rule that "[t]he wisdom, effectiveness, and economic desirability of a statute is not for us to decide." Grievance Committee, 120 N.H. at 863, 424 A.2d 816. We, therefore, cannot join it, and respectfully dissent.